Chief Judge Desmond.
These are proceedings brought by citizens pursuant to section 1 of chapter 773 of the Laws of 1911 to review five statutes (L. 1964, chs. 976, 977, 978, 979, 981) enacted at an extraordinary session of the Legislature held in December, 1964, and which set up four separate .plans for apportioning and districting the (State Senate and Assembly. The petitions list numerous alleged illegalities in various provisions of the challenged 1964 statutes including an assertion that such laws cannot be passed at a special session and an assertion that each of the four plans violates the 'State Constitution in that each establishes an Assembly of more than 150 members whereas the State Constitution in section 2 of article III says: ‘ ‘ The assembly shall consist of one hundred and fifty members.”
After a trial at Supreme Court, Special Term, the court in an opinion and order which discussed many other issues posed by the parties declared the five statutes and their four constituent apportionment-districting plans to be unconstitutional in their entirety but on one ground only, viz., that each plan calls for an Assembly of more than the 150 members prescribed by 'Section 2 of article III of the New York State Constitution. The court held that nothing in earlier Federal court decisions hereafter referred to affects or abolishes the command of section 2 of article III of the State Constitution that there ;be a 150-member Assembly and that the 150-Assemblymen requirement remains valid, subsisting and effective. Other points argued by the parties were treated in the court’s opinion and order but the only two real holdings were: first, that it was not illegal for the Legislature to deal with such matters at an extraordinary or special session; and, second, that the numbers of Assemblymen (variously 165,180, 186 and 174) specified in the four challenged plans, bqing in excess of 150, conflicted with the Constitution so that the statutes were completely invalid, regardless of other attacks.
These same two questions are before us on these appeals (the appeal of respondent State officers is as to the second holding, petitioner’s cross appeal is as to the first). Since *345 the appeal presents only questions as to the constitutional validity of statutes, it -comes direct to us and not to the Appellate Division (N. Y. Const., art. VI, § 3, subd. b, par. [2]; CPLR 5601).
We hold to be in full effect the flat, positive and unmistakable command of the State Constitution that there be 150 members of the State Assembly. Since each -of the four plans violates that command, each plan and all five statutes are invalid. It follows, as we shall explain later on in this opinion, that it is up to the Legislature now to enact a new districting-apportionment statute. As soon as reasonably possible thereafter, a Constitutional Convention should be called into being.
A brief description of the extensive and complicated litigations which bring us to the present impasse will now be attempted. In March, 1962 (the Tennessee case, Baker v. Carr, 369 U. S. 186) the United States Supreme Court held that the Federal courts have subject-matter jurisdiction as to a lawsuit brought to assert that a State legislative representation statute denies the right of citizens to equal protection of the laws, and that a qualified voter has standing to maintain such a -suit. Such a suit (entitled W.M.C.A. v. Simon) had been brought in the Federal court to obtain a judgment that New York’s apportionment laws violated the Federal Constitution and had been dismissed for nonjusticiability by a three-judge District Court (202 F. Supp. 741), but the Supreme Court (W.M.C.A. v. Simon, 370 U. S. 190 [June, 1962]) vacated the dismissal and remanded the case to the District Court for further consideration “ in the light of Baker v. Carr”. On remand the three-judge Federal District Court held that the New York State’s then apportionment laws were valid (W.M.C.A. v. Simon, 208 F. Supp. 368). The decision was appealed and the victory was short-lived. On June 15, 1964 there were handed down the Supreme Court’s series of State apportionment decisions, beginning with the master case of Reynolds v. Sims (377 U. S. 533) and including the WMCA case, now entitled WMCA v. Lomenzo (377 U. S. 633). The Supreme Court applied to New York its rule, announced on the same day in Reynolds v. Sims, that both houses of a bicameral Legislature must under the Fourteenth Amendment’s guarantee of equal protection of the laws be apportioned substantially on an equal population *346 basis. Examining the complicated formula provided in sections 3, 4 and 5 of article III of New York’s Constitution, and the statistics as to population and vote in the New York State Senate and Assembly districts, the highest court decided that the existing apportionment (under 1950 census figures) is, and any reapportionment applying the formulae to 1960 census returns would be, so unequal as to Assembly and Senate district populations as not to be constitutionally sustainable, and that the formulae in the State Constitution necessarily resulted in gross disparities, with comparatively less representation for the populous counties and favoritism to the less populous counties. The Supreme Court, therefore, again remanded the WMCA case to the District Court for further proceedings consistent with the Supreme Court’s opinion in the WMCA and Reynolds v. Sims litigations.
The Supreme Court’s second WMCA opinion ended with this paragraph: “ We find it inappropriate to discuss questions relating to remedies at the present time, beyond what we said in our opinion in Reynolds. Since all members of both houses of the New York Legislature will be elected in November 1964, the court below, acting under equitable principles, must now determine whether, because of the imminence of that election and in order to give the New York Legislature an opportunity to fashion a constitutionally valid legislative apportionment plan, it would be desirable to permit the 1964 election of legislators to be conducted pursuant to the existing provisions, or whether under the circumstances the effectuation of appellants’ right to a properly weighted voice in the election of state legislators should not be delayed beyond the 1964 election. We therefore reverse the decision below and remand the case to the District Court for further proceedings consistent with the views stated here and in our opinion in Reynolds v. Sims.”
We emphasize at this point that neither the Supreme Court nor the District Court ever said or suggested that the 150-mem-ber Assembly limitation was unconstitutional or even involved in the Federal constitutional problems solved in the WMCA case, and that, absent such a holding of Federal unconstitutionality, the limitation remains intact. In its opinion in the master case of Reynolds v. Sims (377 U. S. 533, supra), the Supreme Court had said (p. 584): “ State constitutional pro *347 visions should be deemed violative of the Federal Constitution only when validly asserted constitutional rights could not otherwise be protected and effectuated. Clearly, courts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible.” More specifically in Reynolds v. Sims (p. 581, n. 63) the high court wrote this: ‘ ‘ Determining the size of its legislative bodies is of course a matter within the discretion of each individual State. Nothing in this opinion should be read as indicating that there are any federal constitutional máximums or mínimums on the size of state legislative bodies.” True it is that in describing the New York legislative malapportionment the Supreme Court (WMCA v. Lomenzo, 377 U. S. 633, 654, supra) used this language : ‘‘ With the size of the Assembly fixed at 150, with a substantial number of Assembly seats distributed to sparsely populated counties ”. Appellants would have us read this as a holding by the Supreme Court that the 150 figure is so much and so integral a part of the total New York apportionment scheme that the numerical fixation for Assembly membership falls with the rest. We do not so construe that passing reference in the court’s description of the State plan. Nor did the Federal District Court so read it when (as hereafter described) the WMCA case came to it for the third time. The three-Judge court wrote this (238 F. Supp. 916): “In short, as far as the Federal Constitution is concerned, all the provisions of Article III of the State Constitution relied on by plaintiffs are still operative. Moreover, these provisions are limited in their application only to the extent that they are in unavoidable conflict with the decision of the Supreme Court in WMCA, Inc. v. Lomenzo, supra, or with the July 27, 1964 order of this court. If, as the State suggests, these provisions of Article III are inseparably intertwined with the ‘ constitutional formulas ’ condemned by the Supreme Court, so that all must fall together, this would be a consequence of state law rather than federal law”, and quoted this from Reynolds v. Sims: “ State constitutional provisions should be deemed violative of the Federal Constitution only when validly asserted constitutional rights could not otherwise be protected and effectuated. Clearly, courts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is *348 possible ” (377 U. S., p. 584). Surely this concept permits and requires the preservation of the ‘150 assemblymen ’ ’ provisions voted into our State Constitution by the people of this State.
Summing up as to the impact on New York apportionment of Reynolds v. Sims and WMCA v. Simon (Lomenzo), we say that the Federal tribunals invalidated New York’s legislative apportionment laws because of these factors only: the distribution to underpopulated counties of a large number of Assembly seats without regard to population, plus the ratios provided for Senate .seats, both producing the result that neither House was apportioned so as to result in a “ one man, one vote ” districting.
We return to the WMCA case and its third appearance before the Federal District Court. The court directed that the Legislature enact before April 1, 1965 (since extended to May 5, 1965) a valid apportionment scheme. Then followed the New York Legislature’s special session of 1964 and its enactments. The several statutes passed by the Legislature at the special session and signed by the Governor (each law amending the one enacted before it and each violating the 150-member Assembly provision) embodied four different plans now called, for convenience and in order of enactment, A, B, C and D. Plan D, passed last and so being the one favored by the Legislature, was taken up first by the Federal District 'Court when it gut the WMGA case back before it. None of the four plans were found to violate' the canon: ‘ ‘ one man, one vote ’ ’. But plans D, C and B were all invalidated by the District Court on these grounds: plan D is unconstitutional because it used 1962 voter figures instead of population figures and also because it provided for fractional voting by legislators; plan 0 because of fractional voting provisions; and plan B because it used voter figures instead of population. This left for consideration by the three-Judge court plan A which is the one contested in the present suit and which does not offend in either of the ways that B, C and D do but which does violate the 150-member Assembly provision of section 2 of article III of the ¡State Constitution. The Federal District Court declined to pass on any of the remaining objections stated as to plan A in the WMCA case, holding in effect that these were for the State courts to pass on. This the Federal District Court emphasized when *349 it wrote in'its order of February 16,1965: “1. Article III of the New York State Constitution is invalid under Amendment XIV of the United States Constitution only to the extent that its •provisions are in unavoidable conflict with the decisions of the United States Supreme Court in WMCA, Inc. v. Lomenzo, 377 U. S. 633 (1964) and with the order of this court dated July 27, 1964.”
There was left then for the New York State courts in the present proceedings this question: are any of the provisions of article III of our State Constitution, in addition to those directly passed on by the Federal courts in the WMCA case, in “unavoidable conflict with the Fourteenth Amendment” (equal protection clause) of the Federal Constitution? More specifically and pointedly the question is: how much of article III necessarily falls? No one doubts that, absent “ unavoidable conflict” with Federal constitutional law as expressed in Reynolds v. Sims and WMCA v. Simon, our article III as enacted by the people of New York State not only, subsists but is controlling on the Legislature in passing any reapportionment redistricting laws.
We have already stated our conclusion that nothing in the Federal (WMCA) decisions abolishes thé 150-member provision of our State Constitution. Therefore, we should consider it our duty to save it as a clearly separate and severable item (see People ex rel. Alpha Portland Cement Co. v. Knapp, 230 N. Y. 48, 60-63). “ Our right to destroy is bounded by the limits of necessity. Our duty is to save unless in saving we pervert.” That striking language of Judge Cardozo’s Alpha Cement opinion is surely no less applicable to a Constitution than to a simple statute. Of course, if the 150 limitation were an inseparable part of the larger plan, it could not be saved, but there is no real evidence that it was. Each of our State Constitutions including the first (1777) has prescribed the number of Assemblymen. An 1801 New York constitutional amendment fixed Assembly membership at 100 but ordered that such membership be increased by two each year until a total membership of 150 be reached. Such was the origin of the 150 figure which was, however, not actually arrived at until the Constitution of 1894. From the 1821 Constitution until that of 1894 the number of Assembly members had remained *350 at a constant 128. It was the 1894 Constitution which contained for the first time the elaborate and complex formulae which the Supreme Court struck down as calculated to effect, and effecting, discrimination. Isolated floor speeches and committee reports excerpted from the minutes of the 1894 Convention do not prove that the increase to 150 Assemblymen was directly related to anything other than the increase in the State’s population or that it was so central to the formulae as to be inseparable from them. The 150-member provision is stated separately and must be treated separately.
The only other justification for excising the 150-member constitutional provision would be a showing that the Supreme Court’s mandate for equally populated districts could not be obeyed if the Assembly districts numbered exactly 150. No such showing is made or can be made. Difficulties there will be as we will mention later in another connection but there is no impossibility.
We could put a period to this opinion at this point but we are aware that an affirmance here produces pressing necessity for new legislation. The court should not refrain from giving such guidance as is appropriate for the enactment of a new apportionment-districting act.
The first of the additional questions to be considered arises from the objection that the 1964 statutes were invalid because passed not at a regular session but at a special session of the Legislature. Special Term in the decision here appealed from ruled that passage of such legislation at a special session was not forbidden. We agree. In article III, sections 4 and 5 do in terms require reapportionment at a “ regular session ” but in the only decision of this court on the point we said that the reference to a regular session merely fixed the time and did not limit the power of the Legislature (Matter of Reynolds, 202 N. Y. 430, 443-444). Also, it is useful to note that the 1953 reapportionment (the most recent except for that of 1964) was voted at a special session. The 1953 apportionment was upheld in Matter of Richardson (Stark) (307 N. Y. 269) and, since no point was made of its having been passed at a special session, it would appear that counsel and the courts assumed that invalidity did not result from that circumstance.
*351 . What other parts, if any, of sections 3, 4 and 5 of article III remain binding? First taking up section 5, the unconstitutionality found by the United States Supreme Court relates almost entirely to the second paragraph of that section and to the provision in the first paragraph that each county no matter how small shall have an Assembly member. We see no reason why the balance of section 5 should not be obeyed, especially its requirement that Assembly districts be ‘ ‘ compact * * *
convenient and contiguous ”, and including so far as possible all the other directions in the fourth paragraph of section 5. Section 3 of article III of the Constitution, insofar as it delimits the Senate districts, is completely void. Of course, also, the apportionment and locating of Senate districts by the 1964 statutes fall with the invalidated Assembly districting in the same 1964 statutes since the Constitution (art. III, § 5) says that the apportionment of Assembly districts and Senate districts must be “by the same law”. The third paragraph of section 4 which permits the increase of State Senate districts above 50 is still alive (see Matter of Fay, 291 N. Y. 198) except, of course, that it too is subject to the requirement that districts must be substantially equal in population. The long full paragraph, at the beginning seems still to ¡be applicable except possibly the prohibitions in its last two sentences which should, however, be respected if it be mathematically possible so to do and still obey the “ one man, one vote ” basic rule.
The districting outlawed by the United States Supreme Court as well as all former districtings of this State use the county as the basic unit into which both Assembly and Senate districts are molded, but it is patent that under the new rules the integrity of all the counties in these respects cannot be complete. This means not only that it will be impossible to give each county at least one full Assembly district but also that the boundaries of districts cannot in all instances be co-terminal with county borders. Also, the fourth paragraph of section 5 of article III giving local legislatures the power to draw Assembly district lines in counties having more than one Assembly district must go by the board, since in some instances part of an Assembly district will have to be in one county and part *352 in another. However, the historic and traditional significance of counties in the districting process should be continued where and as far as possible.
As to the suggestion that we should leave redistricting to-the Federal courts, a large part of the answer is in section 1 of, article III of the State iConstitution which says: "The legislative power of this state shall be vested in the .senate and assembly” and in the directives found in sections 4 and 5 of article III. There is no doubt that reapportionment is within the legislative power with' the exercise thereof being subject to constitutional regulation and -limitation (see Matter of Sherrill v. O’Brien, 188 N. Y. 185, 195, as confirmed in People ex rel. Simon v. Bradley, 207 N. Y. 592, 610). In Reynolds v. Sims (377 U. S. 533, 586, supra) the Supreme- Court said that- ‘ ‘ legislative reapportionment is primarily a matter for legislative consideration and determination, and * * * judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.” (That says two things: that the power to apportion is generally legislative, and, second, that the Federal courts intervene only out of necessity—that is, when a State apportionment has been held federally unconstitutional and the State Legislature has failed to pass a valid apportionment. That must necessarily mean not that the Federal courts are to do the apportioning when the State apportionment violates the Federal Constitution but that the Legislature is under an obligation to reapportion and that the Federal courts move in only as a last. resort.
In saving as much as possible of our article III we are not thwarting but carrying out the will of the people of this State. To turn the whole thing over to the Federal courts would be' abdication of the State’s sovereignty. To say that apportionment must wait until a constitutional amendment be' passed would mean that in the considerable intervening time there would be no apportionment law at all in the State. Since the Federal courts have already held that the present legislators came into office last year pursuant to- a districting, which was constitutionally void, the result might be not only that the State would have no apportionment law at all but that we *353 might have no Legislature since the three-man Federal court has ruled that the present Legislature is only being allowed to sit on condition that it promptly pass a new apportionment statute. The courts of this State and especially our court are part of the government of the State and we have our own obligation to do what we can to keep in existence the necessary elements of State government.
An elaborate formula for allocation of Assembly and Senate seats (such as that of 1894) is not an inseparable part of our State Constitution. The very first (1777) Constitution fixed the minimum number of Assemblymen, provided that they were to be chosen annually by counties and allocated the number of Assemblymen for each of the 14 then existing counties (art. IV). The same Constitution said that seven years after the end of the Revolutionay War a census should be taken and that, if the 1777 apportionment of Assemblymen was found to be not in proportion to the number of electors in each county, the legislators should make such an apportionment according to the number of electors in each county, and similarly every seven years thereafter. Likewise, in article XII of the 1777 Constitution, four Senate districts were formed each comprising several counties and a certain number of Senators was assigned to each district with similar provisions for reapportioning according to the number of electors every seven years. These were the apportionment provisions of the 1777 Constitution. Similarly, the Constitutions of 1821 and 1846 simply provided for a division of the State into a fixed number of Assembly and Senate districts and an assignment of numbers of members in proportion to the number of electors. Thus, for the first century and more of the State’s existence we had in effect a “ one man, one vote ” policy of apportionment and it was not until 1894 that the Constitution set up the discriminatory formulae now invalidated by the United States Supreme Court.
The Special Term opinion and order listed a number of Assembly and Senate districts as to each of which, so the court thought, there was a prima facie showing of failure to comply with subsisting provisions of article III. The court stated also that issues of fact had been raised as to what the court called “ the use of the gerrymander ” and that these issues of fact would have to be tried if our court were to reverse the *354 main holdings above referred to. Since affirmance by us would completely remove from the statute books the whole of the four 1964 plans and since an entirely new districting statute would be necessary, we think it inappropriate to pass any comment on these statements in the Special Term order and opinion.
The order should be affirmed, without costs.