**Frances INCE, Dorothy Miles and William J. May, jointly and severally on their own behalf and on behalf of all other citizens of the County of Queens, State of New York and particularly citizens residing in East Elmhurst, who are similarly situated, Plaintiffs,**

**v.**

**Nelson A. ROCKEFELLER, as Governor of the State of New York, Louis J. Lefkowitz, as Attorney General of the State of New York, John P. Lomenzo, as Secretary of State of the State of New York, Malcolm Wilson, as Lt. Governor of the State of New York and Presiding Officer of the Senate of the State of New York and Anthony J. Travia, as Speaker and Presiding Officer of the Assembly of the State of New York, Defendants.**

**No. 68 Civil 1281.**

United States District Court
S. D. New York.
Sept. 30, 1968.

Friedmann & Fischman, New York City, for plaintiffs, William D. Friedmann, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of N. Y., New York City, for defendants, George D. Zuckerman, New York City, of counsel.

## OPINION

POLLACK, District Judge.

Defendants, New York State executive and legislative officials, move to dismiss the complaint herein for lack of subject matter jurisdiction and legal insufficiency of the claim. Rules 12(b) (1) and (6), F.R.Civ.P.

This is a class action brought by three qualified voters who reside in East Elmhurst, one of 44 recognized communities in Queens County. (Tauber and Kaplan, The New York City Handbook, 1968). Plaintiffs claim that as to themselves and others similarly situated in East Elmhurst, the present apportionment of State Assembly Districts—made in 1966 under mandate of the New York Court of Appeals in Matter of Orans, 17 N.Y.2d 107, 269 N.Y.S.2d 97, 216 N.E.2d 311 (1966) —violates the United States Constitution, Amendments XIV and XV. Plaintiffs, in attacking the constitutionality of the 1966 apportionment plan on these allegations, seek to reactivate a dispute which ricocheted within the state and federal judicial systems, between state and federal courts, and between the courts and the New York legislature from 1961 until 1966. (See Appendix to this opinion for a brief review of the complex state and federal litigation culminating in the present apportionment.)

## ALLEGATIONS OF THE COMPLAINT

Under the present apportionment plan, the predominantly Negro community of East Elmhurst is divided between the 23rd and 31st Assembly Districts. This division of the community is characterized by the plaintiffs as an "irrational, racially motivated, invidiously discriminatory scheme whereby the plaintiffs and other citizens of East Elmhurst, particularly Negro citizens there, are deprived of the right to cast effective votes for their representatives in the New York State Assembly * * * ". Plaintiffs in effect seek a District from which they presumably would be able to elect a Negro Assemblyman by the use of the full leverage of their homogeneity.

The factual allegations of the complaint are deemed admitted for the purposes of the issues raised by the motions. Accordingly, it appears that:

In the 1960 census, East Elmhurst contained approximately 20,000 people of whom approximately 10,000 were Negroes. Population movements since the census have resulted in a clear and growing majority of Negroes in East Elmhurst. According to the 1960 census, the 23rd and 31st Assembly Districts are virtually equal in population, each containing just over 108,000 persons. Matter of Orans, 17A N.Y.2d Map 8.

The present apportionment plan divides East Elmhurst between two Assembly Districts; five largely Negro election districts are now included in the heavily white 23rd Assembly District, and the remainder of East Elmhurst is included in the 31st Assembly District.

The portion of East Elmhurst placed in the 23rd Assembly District is not contiguous with the rest of that District, being widely separated therefrom by Flushing Bay, Flushing River, Flushing Meadow and a major highway complex-interchange but not by any residential area. This East Elmhurst portion of the 23rd Assembly District is geographically contiguous with Elmhurst and Corona—which are in the 31st Assembly District. (See MAP appended to the end of this opinion.)

It is alleged that the voters residing in East Elmhurst tend to have a common point of view on many of the important issues facing a State Assemblyman, including civil rights, education, law enforcement, minimum wages, housing, social welfare, taxation, and others; and further, that, being similarly situated, they are similarly affected by the actions of the State Assembly upon these issues.

As a result of the division of their community between the two Assembly Districts (whether motivated by racial or other considerations) the people of East Elmhurst are allegedly prevented from being a significant political force in either one; they are unable to elect either party leaders in the primaries or Assemblymen in the general elections who reflect and are concerned with their problems and points of view. Such circumstances allegedly constitute an effective deprivation of their right to vote in violation of the United States Constitution, Amendments XIV and XV.

The gravamen of the claim is impairment of voting rights—rights fundamental "because preservative of all rights". Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

## JURISDICTION

Plaintiffs invoke the jurisdiction of this Court under the civil rights statutes, 42 U.S.C. §§ 1983, 1988 and 28 U.S.C. § 1343, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Plaintiffs also seek a hearing by a special three-judge district court under 28 U.S.C. §§ 2281, 2282 and 2284.

The complaint prays for declaratory and injunctive relief. It requests that the present apportionment of State Assembly Districts, as it affects the community of East Elmhurst, be declared to be invalid under the United States Constitution, Amendments XIV and XV; and that the Court enjoin the defendants, after the general election of 1968, from conducting any elections for State Assemblymen in Queens County under

the present (1966) apportionment plan. Plaintiffs also request the Court to direct the defendants, representing the executive and the legislative branches of the government of the State of New York, to reapportion the Assembly Districts of Queens County in accordance with the United States Constitution and the rights of plaintiffs and of all others similarly situated.

■ On its face, the complaint asserts violations of the United States Constitution. These allegations do not appear to be either wholly immaterial or made solely for the purpose of obtaining jurisdiction. This Court, therefore, has jurisdiction of the subject matter of the complaint to determine whether a claim is stated upon which relief can be granted. Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Jurisdiction is not lacking to decide the legal sufficiency of the claim merely because of the possibility that the allegations will not withstand a legal test thereof or require a determination of any issues of fact arising in the controversy. (Ibid.)

■ A district judge, sitting alone (but, of course, subject to review), is authorized to determine in the first instance whether or not a case is one for the convening of a special three-judge panel of the District Court. J. B. Schermerhorn, Inc. v. Holloman, 74 F.2d 265, 266 (10th Cir. 1934), cert. den. 294 U.S. 721, 55 S.Ct. 548, 79 L.Ed. 1253 (1935). For the reasons stated below, it is held that this case does not warrant a three-judge panel.

■ It is settled that under § 2281 a three-judge panel may be convened only where: the complaint challenges a state statute; the statute is of general application throughout the state; a state officer is a party defendant; injunctive relief is sought; and a substantial federal constitutional issue is raised. Absent any one of these prerequisites there is no statutory basis for convening a three-judge panel. Hinton v. Threet, 280 F.Supp. 831, 835 (M.D.Tenn.1968);

Liveright v. Joint Committee of General Assembly, 279 F.Supp. 205 (M.D.Tenn. 1968).

■ The three-judge statute is "not * * * a measure of broad social policy to be construed with great liberality, but * * * an enactment technical in the strict sense of the term and to be applied as such". Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800 (1941).

In light of this rule of construction, the presence here of the first of the five statutory prerequisites is questionable, viz., a state statute, or its equivalent, which has been challenged. Here we are dealing with a judicial decree, not a legislative enactment, by which an apportionment plan was promulgated. Query whether such a decree may be equated with a state "statute" within the meaning of § 2281. It is true that a statute in its strictest sense is not prerequisite. In A. F. of L. v. Watson, 327 U.S. 582, 592–593, 66 S.Ct. 761, 766, 90 L.Ed. 873 (1946), the Supreme Court said that:

"In our view the word 'statute' in § 266 [the predecessor of § 2281] is a compendious summary of various enactments, by whatever method they may be adopted, to which a State gives her sanction * * * "

and thus administrative orders of state agencies and state constitutional provisions have been held to be "statutes". However, research has not disclosed any case holding that a judicial decree is similarly within the reach of § 2281.

Nor is it clear that the relief sought and the constitutional challenge presented here are of general and statewide application, so as to require the convening of a three-judge court. The Supreme Court has frequently reviewed the legislative history of § 2281 and has repeatedly concluded that its purpose was " 'to prevent a single federal judge from being able to paralyze totally the operation of an entire regulatory scheme * * * by issuance of a broad injunctive order' (Kennedy v. Mendoza-Martinez, 372 U.S. 144, 154, 83 S.Ct. 554, 560, 9 L.Ed.2d 644

882

(1963) * * * ". Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 1547, 18 L.Ed.2d 643 (1967), and see cases cited therein. And in Phillips v. United States, supra, 312 U.S. at 251, 61 S.Ct. at 483:

> "The crux of the business is procedural protection against an improvident state-wide doom by a federal court of a state's legislative policy. This was the aim of Congress and this is the reconciling principle of the cases."

The injunctive relief here sought is only as to one small corner of but one of the State's 62 counties. This suit concerns not a cohesive statewide system of legislation, Cf. Flast v. Cohen, 392 U.S. 83, 88–89, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), but rather a situation unique to a portion of Queens County.

Furthermore, the Supreme Court has said that a three-judge court is not required when the claim of unconstitutionality "is wholly insubstantial, legally speaking non-existent." Bailey v. Patterson, 369 U.S. 31, 33, 82 S.Ct. 549, 551, 7 L.Ed.2d 512 (1962). As we shall see, the claim here is insubstantial and is foreclosed as a litigable issue.

■ Accordingly, it is held that the jurisdiction of this Court, sitting alone, is not limited by 28 U.S.C. § 2281. Griffin v. County School Board, 377 U.S. 218, 228, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).

## SUFFICIENCY OF THE COMPLAINT

The plaintiffs herein base their allegation that the division of East Elmhurst was "racially motivated" solely on the contention that a recognized community having a majority of Negro residents was divided between two Assembly Districts, resulting in the loss of unitary voting strength of the Negro residents in the East Elmhurst community.

Plaintiffs' naked assertion of racial motivation is devoid of legal significance. The complaint is barren of allegations of fact to support it. Something of substance must be alleged, and the strong presumption of validity must be overcome by factual allegations.

## FORMULATION OF THE PRESENT PLAN

The Court and public records strongly support the presumption of the validity of the plan under attack here. After countless decisions, orders and appeals on all levels of the federal and state judicial systems, the New York Court of Appeals, in 1966, appointed a Commission of distinguished citizens to "hold hearings and prepare and submit to [the Court] a complete and valid reapportionment plan for the Senate and Assembly of the State * * *." Matter of Orans, 17 N.Y.2d 601, 268 N.Y.S.2d 561, 215 N.E.2d 682 (1966). Pursuant to this mandate, the Commission invited "all interested persons to submit suggestions in writing to the Commission * * *." Report of Judicial Commission, March 22, 1966, 17A N.Y.2d 7.

The Commission held a public hearing on March 2, 1966 in the courtroom of the Court of Appeals at which counsel for the parties in Matter of Orans were heard. Two reapportionment plans, one passed only by the Assembly on February 14, 1966 (Assembly Intro. 3799, Pr.A. 3883; Senate Intro. 2025, Pr.S. 2078), and the other passed only by the Senate (Senate Intro. 2051, Pr.S. 2014; Assembly Intro. 4009, Prs.A. 4103, 4430), were considered at the Commission hearings.

In drawing its own plan, the Commission "adopted district lines contained in one or both of [the legislative] bills wherever [the Commission] deemed it appropriate to do so." 17A N.Y.2d at 8.

The Commission stated in its report to the Court of Appeals that "[i]n all cases, the plan recommended represents our best judgment as to the proper districting in this large and populous state, with its countless complex situations.

"Our recommendations are based on the overriding requirement of the United States Supreme Court decisions, the mandates of the New York State Constitution * * * and the decisions of this Court [with respect to compactness and contiguity] * * *, at the same time

endeavoring to prevent inequities". 17A N.Y.2d 7 at 8.

The report of the Commission was submitted to the Court of Appeals which invited any citizen or governmental body affected to apply by a given date to the Court for any appropriate relief from technical defects in description or other inadvertences in the plan. Twenty-one applications were filed. Among these, an objection respecting an omission of the Town of DeWitt in Onondaga County was sustained. 17 N.Y.2d 721, 269 N.Y. S.2d 971, 216 N.E.2d 834. The applicants included the Senator from the 8th Senatorial District in Queens and the Assemblyman from the 22nd Assembly District in Queens.

The Court of Appeals "examined the plan * * *, found it to be complete and valid under the Constitution of the United States and the Constitution of the State of New York * * *" and stated that "we hereby promulgate and establish it to govern the election of Senators and Assemblymen at the November, 1966 election and thereafter until validly superseded * * *." 17 N.Y.2d 107, 110, 269 N.Y.S.2d 97, 98, 216 N.E.2d 311, 312.

Under the 1966 plan nearly every voting district in Queens lacks geometric symmetry and rectangular proportions. In addition to areas of high and low population density, the Court-appointed Commission was faced with pre-existing communities and natural barriers, such as Flushing Bay (contained in the 23rd District). That the contiguity of Assembly Districts and the maintenance therein of community homogeneity suffered in the plan promulgated by the Court of Appeals was to be expected. These facts are not evidence of racial discrimination.

East Elmhurst was not the only community in Queens divided between two or more Assembly Districts. Similar splits occurred in Forest Hills (25th and 28th Assembly Districts); Woodhaven (28th and 29th Assembly Districts); Jackson Heights (31st and 32nd Assembly Districts); Glendale (27th, 29th and 34th Assembly Districts); and Woodside (30th and 34th Assembly Districts). (See 17A N.Y.2d, maps and descriptions of districts).

It is obvious that each of the 44 communities in Queens could not be treated as separate entities in the establishment of 16 equal assembly districts that Queens County was entitled to by virtue of its population. Pleas for separate community recognition, similar to those raised by plaintiffs here, were made by intervenors from Flatbush and Bay Ridge in contesting the recently enacted congressional districts in New York State. In rejecting their contentions, the three-judge Court in its unanimous opinion in Wells v. Rockefeller, 281 F.Supp. 821, 825 (S.D.N.Y.1968) stated:

"The Legislature cannot be expected to satisfy, by its redistricting action, the personal political ambitions or the district preferences of all of our citizens. For everyone on the wrong side of the line, there may well be his counterpart on the right side. The twenty or more identifiable communities of Brooklyn may well have preserved their own traditions from the days of the Dutch, although in today's rapidly changing world, this is doubtful. But even Brooklyn's large population will not support twenty community congressmen. Of necessity, there must be lines which divide."

Nor is the separation of two sections of the 23rd Assembly District by Flushing Bay and a section of a highway of constitutional importance. There is no federal constitutional right either to contiguity or compactness of voting districts, Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131 (1932), and in any event no part of any district separates the two sections of the 23rd Assembly District.

The *factual* allegations of this complaint are to be sharply distinguished from those in Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), relied upon by the plaintiffs.

In *Gomillion*, the plaintiffs, Negro voters, complained of being segregated

and denied their voting status. The Alabama legislature altered the boundaries of a city, Tuskegee, to form a 28 sided figure out of what had been a square. The effect of the alteration of the districts in *Gomillion* was to exclude from city voting rolls all but four or five of its 400 Negro voters. No rational justification for the legislative Act was presented.

Here, no Negroes are disenfranchised by the New York reapportionment plan, and no voting rights are extinguished. Each East Elmhurst voter is, in fact, for the first time accorded voting strength equal to that of an upstate voter under the doctrine of "one person, one vote". (It is conceded that the 23rd and 31st Assembly Districts are substantially equal in population [23rd District: 108,318 persons; 31st District: 108,314 persons. 17A N.Y.2d 7, 17] and that the population of each Assembly District in New York State is substantially equal in population to those two.)

In *Gomillion*, assuming the truth of the allegations in the complaint, "the conclusion [was] * * * irresistible, tantamount for all practical purposes to a mathematical demonstration, that the legislation is solely concerned with segregating white and colored voters by fencing Negro citizens out of town * * *." 364 U.S. at 341, 81 S.Ct. at 127. No such conclusion may be drawn from the facts alleged in the complaint herein.

■ Framers of voting districts are required to be color blind. Neither the concept of "one person, one vote" nor the provisions of the Fourteenth or Fifteenth Amendments guarantee to Negroes or to any other racial or national group the right to concentrated voting power.

In Mann v. Davis, 245 F.Supp. 241 (E.D.Va.), aff'd. sub nom. Burnette v. Davis, 382 U.S. 42, 86 S.Ct. 181, 15 L.Ed. 2d 35 (1965), certain Negro residents of the city of Richmond attacked the fusion of Richmond and Henrico Counties into one Assembly District on the ground that it deprived Negroes of a chance to elect one of their own race to the General Assembly. Had Richmond been divided into five Assembly Districts, as was warranted by its population, the non-white voters would have controlled one district; in the combined district they constituted a small minority. In rejecting the claim of the Negro intervenors, the statutory three-judge court held that:

"The concept of 'one person, one vote', we understand, neither connotes nor envisages representation according to color. Certainly it does not demand an alignment of districts to assure success at the polls of any race. No line may be drawn to prefer by race or color". 245 F.Supp. at 245.

See also, Kilgarlin v. Martin, 252 F.Supp. 404 (S.D.Tex.1966), rev'd on other grounds sub nom. Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967).

Stripped of its conclusory allegations, the complaint appears as an unabashed plea for segregation in the composition of Assembly Districts, for color consciousness rather than color blindness. Speaking in a different context, Mr. Justice Douglas has emphasized the repugnance of such a plea to the principles of democracy: "Racial boroughs [like rotten boroughs], are * * * at war with democratic standards." Wright v. Rockefeller, 376 U.S. 52, 62, 84 S.Ct. 603, 609, 11 L.Ed.2d 512 (1964) (dissenting opinion).

■ Any purposeful attempt to maintain a majority of persons of one race within a given district would, in fact, raise grave constitutional questions. Wright v. Rockefeller, 211 F.Supp. 460, 468–469 (S.D.N.Y.1962) (concurring opinion by Feinberg, J.) aff'd. 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964).

## ABSTENTION

Even if it were to be assumed that enough has been alleged to require a factual inspection under the civil rights statutes of the allegations in the complaint, there is yet another reason why this Court should refrain, at least at present, from exercising its jurisdiction

and should defer to the courts of New York State.

In so holding the Court does not proceed from any notion that the plaintiffs are required, as a matter of law, first to exhaust their state court remedies. Rights under the federal constitution are always a proper subject for federal adjudication. Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed. 2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Rather, the doctrine of federal abstention is the basis on which this Court declines to exercise its jurisdiction at this time.

As between the states and the federal government, there exists no hierarchy of power and scrupulous care must be taken to preserve to the states primary responsibility for dealing with matters affecting them directly * * * "[A] federal district court is vested with discretion to decline to exercise or to postpone the exercise of its jurisdiction in deference to state court resolution of underlying issues of state law." Harman v. Forssenius, 380 U.S. 528 at 534, 85 S.Ct. 1177 at 1181, 14 L.Ed.2d 50 (1965).

Harman v. Forssenius involved a Virginia statute that allegedly violated the Twenty-fourth Amendment to the United States Constitution banning poll taxes. Chief Justice Warren, speaking for a unanimous court, 380 U.S. at 534, 85 S. Ct. at 1182, declared:

"Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional ad-

judication. * * * The doctrine, however, contemplates that deference to state court adjudication only be made where the issue of state law is uncertain."

It is plain that the claim presented in this Court raises serious questions under the New York Constitution, Article I, § 11 (The Equal Protection Clause) and Article III; § 5 (The Compact and Contiguous Districts Clause); * and see, Matter of Richardson, 307 N.Y. 269, 121 N.E.2d 217 (1954) and particularly the dissenting opinion by Judge Fuld (now Chief Judge) at 275–276, 121 N.E.2d 217. The final paragraph of Article III, § 5 gives the plaintiffs a constitutional right to have their claim adjudicated in a New York Supreme Court with a calendar preference.

Avoidance of unnecessary friction in federal-state relations could be a purpose well served by abstention in this case of the federal district court.

"Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies * * *. * * * [T]he federal courts, 'exercising a wise discretion,' restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary." Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 500–501, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941).

Seldom have the state and federal courts been subjected to a more unseemly course of litigation than that surrounding reapportionment in New York. Yet federal jurisdiction has, throughout, been exercised with extreme reluctance (see cases cited in Appendix). There can be no question that the apportionment of a Legislature is one of the most important state functions. In Scott v. Germano, 381 U.S. 407, 408, 85 S.Ct. 1525, 14 L.E.2d 477 (1965), involving reap-

* Assembly Districts are required by the New York Constitution, Article III, § 5 to be " * * * of convenient and contiguous territory in as compact form as practicable * * *." (Para. 4).

portionment in Illinois, the Supreme Court reversed the district court decision not to abstain; the Supreme Court observed that the power of a state judiciary to manage the apportionment process had not only been specifically recognized but had also been "specifically encouraged" (381 U.S. at 409, 85 S.Ct. 1525), and cited Scranton v. Drew, 379 U.S. 40, 85 S.Ct. 207, 13 L.Ed.2d 107 (1964), which was the Pennsylvania reapportionment litigation.

■■■■ It is also a purpose of abstention to avoid premature constitutional adjudication. No court should go out of its way to reach a constitutional question before it has to do so. The principle has been consistently and clearly expressed that federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them. Harrison v. N. A. A. C. P., 360 U.S. 167, at 176–177, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959).

Further, the present case deals not with a legislative enactment but with a state court decision, review of which is traditionally eschewed by a federal district court; due regard for the proper functioning of federal and state judiciaries suggests that this Court avoid constitutional inquiry before the state courts have themselves considered the matter if properly called to their attention. Under the special circumstances surrounding the creation of the 1966 reapportionment plan, this Court should tread warily.

■■■■ The Court is therefore inclined to abstain from acting as *deus ex machina* in a local dispute.

## RES JUDICATA

The defendants assert that Matter of Orans, 17 N.Y.2d 107, 269 N.Y.S.2d 97, 216 N.E.2d 311 (1966), a class action on behalf of all the citizens and taxpayers of the State of New York in which the Court of Appeals held valid and promul-

gated the apportionment plan now under attack operates as *res judicata* to bar the present claim. In its order, 17 N.Y.2d at 110, 269 N.Y.S.2d at 98, 216 N.E.2d at 312, the New York high court declared:

"We have examined the plan * * *, found it to be complete and valid under the Constitution of the United States and the Constitution of the State of New York and we hereby promulgate and establish it to govern * * *."

■■■■ Ordinarily, a state court's decision may not be reviewed in a federal district court by means of a bill in equity. Davega-City Radio v. Boland, 23 F.Supp. 969, 970 (S.D.N.Y.1938). Normally, the state action is *res judicata* as to all subsequent actions. East Crossroads Center v. Mellon-Stuart Co., 245 F.Supp. 191, 194–195 (W.D.Pa.1965); and cases cited therein. But the situation faced here is neither normal nor ordinary. In fact, it is altogether extraordinary. (See Appendix.)

Were the plaintiffs' claim to stand or fall on the issue of *res judicata* the effect of that doctrine herein would merit careful consideration. Such, however, is not the case, for the Court has concluded on other grounds that it should not proceed to a determination of the factual merits of this case.

■■■■ The Court concludes (1) that the naked assertions in the complaint of "racial motivation" and "invidious discrimination" are unsupported by any allegations of fact, (2) that the other allegations of the complaint fail to state a claim upon which relief can be granted under the Constitution and laws of the United States, and (3) that if the complaint does state a sufficient claim, it should be presented in the first instance to a tribunal of the State and correction of alleged infirmities should be sought therein.

Accordingly, the complaint is dismissed, with costs.

So ordered.

MAP

— Queens Coast line

--- Highways, etc.

— District Lines

== Disputed Boundary

from tracing 17A NY 2d Map ¢.
1966

EAST ELMHURST

East River

23 rd

Flushing Bay

Flushing

LaGuardia

VAN WYCK EXPRESSWAY

Shea Stad

FLUSHING

N.Y. WORLD FAIR

MEADOW

31 st

## APPENDIX

The litigation over apportionment in New York was so extensive that a review thereof may be useful in connection with the foregoing Opinion.

An action to declare unconstitutional New York's predecessor apportionment statute was commenced in the United States District Court, Southern District of New York, in 1961, W.M.C.A., Inc. v. Simon, 196 F.Supp. 758 (S.D.N.Y.1961). The complaint therein was dismissed by a three-judge panel for lack of justiciability. 202 F.Supp. 741 (S.D.N.Y.1962). In the light of its decision in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663 (1962), the Supreme Court remanded W.M.C.A., Inc. v. Simon to the said district court for further consideration. 370 U.S. 190, 82 S.Ct. 1234, 8 L.Ed. 2d 430 (1962).

The three-judge district court again dismissed, holding that Baker v. Carr required a showing of invidious discrimination, not merely disproportion of population in assembly districts. W.M. C.A., Inc. v. Simon, 208 F.Supp. 368 (S.D.N.Y.1962). Again the dismissal was vacated by the Supreme Court, WM CA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964), this time on the basis of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), a companion case which held that both houses of a bicameral state Legislature must be selected according to the principle of "one person, one vote".

On remand, the three-judge court, by order dated July 27, 1964, (61 Civ. 1559) held the New York apportionment statute unconstitutional, and ordered the Legislature to submit by April 1, 1965 a new plan of apportionment. One of four such plans (Plan A) submitted by the Legislature was approved in WM CA, Inc. v. Lomenzo, 238 F.Supp. 916 (S.D.N.Y.1965). The three-judge court refused, however, to pass upon the plan's validity under the New York Constitution, and refused to stay state court proceedings instituted to declare the plan invalid thereunder. Finding that the state court case involved matters solely of state law, the Court concluded that no conflict of jurisdiction would occur; but jurisdiction was retained for such further proceedings as might be necessary. This disposition of the matter was summarily affirmed, sub nom. Hughes v. W.M.C.A., Inc., 379 U.S. 694, 85 S.Ct. 713, 13 L.Ed. 2d 698 (1965).

*Matter of Orans* in the state court proceeded simultaneously with the federal suit, and the state court held that the plan approved by the federal district court violated the State Constitution. (Matter of Orans, 45 Misc.2d 616, 257 N.Y.S.2d 839 [Sp.Tm., N.Y.Co.1965]). The suit had been brought under L.1911 c. 773 (McKinney's Unconsolidated Laws, § 4221 et seq.) authorizing judicial review by "any citizen" of a legislative apportionment of voting districts. The State Supreme Court's declaration of unconstitutionality was affirmed, Matter of Orans, 15 N.Y.2d 339, 258 N.Y.S.2d 825, 206 N.E.2d 854 (1965). An appeal therefrom by the State officials to the Supreme Court was dismissed for want of a federal question. (Rockefeller v. Orans, 382 U.S. 10, 86 S.Ct. 75, 15 L.Ed. 2d 13 (1965)).

Nevertheless, the three-judge district court in W.M.C.A., Inc. v. Lomenzo (61 Civ.1559) on May 24, 1965 ordered that 1965 elections should proceed under the plan approved by it. An application to accelerate an appeal and pending appeal to stay the district court order was denied by the Supreme Court, sub nom. Travia v. Lomenzo, 381 U.S. 431, 85 S.Ct. 1582, 14 L.Ed.2d 480 (1965).

Thereafter, a new action (Glinski v. Lomenzo) was commenced in the Supreme Court of the State of New York, Albany County, to enjoin state officials from proceeding under the plan authorized by the federal court. Injunctive relief against the state officials was granted on appeal in the Albany case, on the grounds that the May 18, 1965 order of the federal court was not final. Glinski v. Lomenzo, 16 N.Y.2d 27, 261 N.Y. S.2d 281, 209 N.E.2d 277 (1965), modifying 24 A.D.2d 655, 261 N.Y.S.2d 280 (3d Dept. 1965). This order was direct-

ly countermanded by an order of the three-judge district court on July 13, 1965, W.M.C.A., Inc. v. Lomenzo (61 Civ. 1559), enjoining all persons from interfering in any way with the holding of the elections under the federally approved plan. The Supreme Court (per Mr. Justice Harlan), on July 19, 1965, refused to stay this district court order pending appeal.

Immediately upon denial of the stay of the district court injunction, the Speaker of the New York State Assembly (Hon. Anthony Travia) and the President Pro Tem of the Senate (Hon. Joseph Zaretski) applied to intervene in the earlier New York County state court proceedings (Matter of Orans). Leave was sought "on their own behalves, as members of the Legislature, citizens and taxpayers and on behalf of all citizens and taxpayers of New York." Matter of Orans, 47 Misc.2d 493, at 494, 262 N.Y.S.2d 893, at 895 (Sp.Tm. N.Y. County 1965).

Intervention of Senator Zaretski was opposed on the grounds that the interests of those he purported to represent were adequately represented by the existing petitioners. Intervention was granted pursuant to New York's CPLR § 1012 (a) 2, which allows intervention as of right to *any person* "when the representation of the person's interest by the parties is or may be inadequate and the person is or may be bound by the judgment * * *."

Intervention was further opposed on the grounds that the original proceeding in Matter of Orans ended in a final judgment (45 Misc.2d 616, 257 N.Y.S.2d 839) affirmed by the Court of Appeals (15 N.Y.2d 339, 258 N.Y.S.2d 825, 206 N.E.2d 854) and that this "exhausted" the Court's power to proceed pursuant to the special statutory review provision L.1911, c. 773). This statute empowered the Court to grant "such relief as is necessary to effectuate the court's primary determination", 47 Misc.2d at 498, 262 N.Y.S.2d at 898. The state court (Culkin, J.) said that the three-judge district court's injunctive order had frustrated enforcement of the injunction issued in Glinski v. Lomenzo, 16 N.Y.2d 27, 261 N.Y.S.2d 281, 209 N.E. 2d 277 (1965), by ordering the November 1965 election to be held pursuant to Plan A.

The intervenors sought reference to a Special Referee or panel of referees or jury of experts to formulate a comprehensive plan of reapportionment of the Senate and Assembly of New York. This was refused by the Court which said that it would take matters into its own hands if the Legislature did not submit a constitutionally satisfactory reapportionment plan to the Court by February 1, 1966 (47 Misc.2d at 503, 262 N.Y.S.2d 893).

The Court cited numerous Supreme Court cases in which it was held that a state court had the power to reapportion: Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964); Scranton v. Drew, 379 U.S. 40, 85 S.Ct. 207, 13 L. Ed.2d 107 (1964); Scott v. Germano, 381 U.S. 407, 409, 85 S.Ct. 1525, 14 L.Ed. 2d 477 (1965).

In Scott v. Germano, supra, the Supreme Court dealt with the question of conflicting federal-state jurisdiction. The Supreme Court stated that the district court "should have stayed its hand" until after the state court itself had had a chance to reapportion. The lower New York Court in Matter of Orans, 47 Misc. 2d at p. 502, 262 N.Y.S.2d at p. 902, weighed the question whether to assume direct supervision and determined that "'[t]o turn the whole thing over to the Federal courts would be an abdication of the State's sovereignty.'" (quoting Matter of Orans, 15 N.Y.2d 339, 352, 258 N.Y.S.2d 825, 206 N.E.2d 854 [1965].

The Appellate Division (24 A.D.2d 217, 265 N.Y.S.2d 49 [1965]) and the Court of Appeals (17 N.Y.2d 107, 269 N.Y.S.2d 97, 216 N.E.2d 311 [1966]) approved Justice Culkin's disposition of the matter, but the Court of Appeals modified his order to the extent that it did not await apportionment by the Legislature. Instead, it appointed a five-man Commis-

sion with instructions to hold hearings and present a reapportionment plan to the Court of Appeals. (17 N.Y.2d 601, 268 N.Y.S.2d 561, 215 N.E.2d 682 (1966), affirming, 24 A.D.2d 217, 265 N.Y.S.2d 49 (1965)).

The five-man Commission held public hearings, drew up a plan, and reported to the Court of Appeals. The Court of Appeals found the plan to be "complete and valid under the Constitution of the United States and the Constitution of the State of New York". Matter of Orans, 17 N.Y.2d 107, 110, 269 N.Y.S.2d 97, 98, 216 N.E.2d 311, 312 (1966). This plan was promulgated and established to govern the election of Senators and Assemblymen in the 1966 election and subsequent elections until superseded by a legislative apportionment scheme. Maps and descriptions of the plan were printed in 17A N.Y.2d.