Jasen, J.
This is a consolidated proceeding to review chapter 11 of the Laws of 1972 which redistricted and reapportioned the State Legislature. (N. Y. Const., art. III, § 5; L. 1911, ch. 773, § 1.) The principal issues juxtapose the Federal constitutional requirement that State legislative districts be substantially equal in population (U. S. Const., 14th Amdt., § 1; Reynolds v. Sims, 377 U. S. 533) and the State constitutional requirements that legislative districts be “ compact “ contiguous' ”, “ convenient ” and conterminous with traditional political subdivisions. (N. Y. Const., art. III, §§ 4, 5.) The remaining issues relate to State constitutional requirements for enlarging the State Senate (N. Y. Const., art. III, § 4), for enacting a bill into law (N. Y. Const., art. III, § 14), and for employing the latest Federal census data in reapportioning the Legislature (N. Y. Const., art. III, § 4).
I
Petitioners argue that in redistricting the Senate .and Assembly, the Legislature went too. far in implementing the equal-population principle by .unnecessarily dividing some counties, contrary to the State. Constitution. (N. Y. Const., art. IIII, §§ 4, 5.)
Reynolds v. Sims (377 U. S. 533, supra) and its progeny recognize that “ representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State’s legislative bodies.” (377 U. S., at p. 565.) Therefore, [f]ull and effective participation by all citizens in state government requires * * * that each citizen have an equally effective voice in the election of members of his state legislature.” (377 U. S., at p. 565.)
In assessing the impact of Reynolds on our State constitutional requirements that legislative districts conform to county lines *427 (N. Y. Const., art. III, §§ 4, 5), we recognized the pre-eminence of the equal-population principle, hut said “ the historic and traditional significance of counties in the districting process should be continued where and as far as possible.” Matter of Orans, 15 N Y 2d 339, 352.)
Applying this rule to these proceedings, we find that the Legislature had the principle of equal-population uppermost in mind and that it achieved a districting plan in substantial conformity with it. For example, in the Senate, the plan produces a total deviation from population equality of only 1.82%; and in the Assembly, the deviation is just 3.38%. In terms of equality of population among legislative districts, this plan is the most precise in the history of the State.
While it is true that the legislative plan segments 9 minor counties[1] in the Senate and 11 minor counties in the Assembly, it does not follow that the plan is fatally defective under the State Constitution. The Federal constitutional requirement of substantial equality of population among legislative districts is pre-eminent and our State constitutional requirements must be harmonized with the Federal standard.
While petitioners urge several alternate plans which they claim approach mathematical exactness and minimize or eliminate violations of county lines, we would emphasize that it is not our function to determine whether a plan can be worked out that is superior to that set up by chapter 11. Our duty is, rather, to determine whether the legislative plop substantially complies with the Federal and State Constitutions.
In support of one plan[2], petitioners argue that the strict standard of population equality applicable to congressional apportionment (see, e.g., Kirkpatrick v. Preisler, 394 U. S. 526, and Wells v. Rockefeller, 394 U. S. 542) does not govern State legislative apportionment. They conclude that greater population variances are permissible at the State legislative level and *428 that there is, therefore, more leeway for consideration of traditional political subdivisions in drawing State legislative districts,
Petitioners rely on Abate v. Mundt (403 U. S. 182, affg. 25 N Y 2d 309), wherein the Supreme Court upheld the apportionment of the Bockland County Board of Supervisors with a total deviation from population equality of 11.9%. In Abate, however, the court reaffirmed the principles of Reynolds v. Sims (377 U. S. 533, supra) and its progeny and emphasized that ‘ ‘ our decision is based on the long tradition of overlapping function and dual personnel in Bockland County government and on the fact that the plan * * * does not contain a built-in bias tending to favor particular political interests or ¡geographic areas.” (403 U. S., at p. 187.)
While we would agree that Abate perhaps sigiláis a reappraisal by the court of apportionment standards for local government[3], we think that the authorities amply support the choice of maximum population equality as a guiding principle in redistricting and reapportioning the State Legislature. Indeed, we are of the opinion that the standards for State legislative and congressional apportionment are substantially the same. (See, e.g., Kirkpatrick v. Preisler, 394 U. S. 526, supra, and Wells v. Rockefeller, 394 U. S. 542, supra [congressional districting] ; Swann v. Adams, 385 U. S. 440 [State legislative districting) ; Ely v. Klahr, 403 U. S. 108; Abate v. Mundt, 403 U. S. 182, 187, supra [Brennan, J., dissenting]; Hensley v. Wood, 329 F. Supp. 787 [E. D. Ky.]; Howell v. Mahan, 330 F. Supp. 1138 [E. D. Va.]; Ferrell v. State of Oklahoma ex rel. Hall, 339 F. Supp. 73 [W. D. Okla.]; Graves v. Barnes, 343 F. Supp. 704 [W. D. Tex.].)
We conclude, therefore, that where, as here, the Legislature has made a good-faith effort to comply with the mandate of the *429 equal-population principle (as evidenced by the near equality of population in the legislative districts), and has not unduly departed from our State constitutional command that the integrity of counties be preserved, the legislative plan ought to be upheld.
II
It is also contended that chapter 11 constitutes a partisan gerrymander and petitioners would have us set it aside on both Federal and State constitutional grounds. First, it is said that chapter 11 violates the State Constitution’s anti-gerrymander provisions requiring that legislative districts be “compact”, “contiguous” and “convenient”. (N. Y. Const., art. III, §§ 4, 5.) Second, it is argued that chapter 11, in effect, dilutes the voting strength of a political element of the population and, thus, violates the Equal Protection Clause. (U. S. Const., 14th Amdt., § 1.)
The anti-gerrymander provisions of the State Constitution are found in article III. Section 4 requires that Senate districts “be in as compact form as practicable” and “consist of contiguous territory ’ ’; and section 5 provides that Assembly districts shall be formed from ‘ ‘ convenient and contiguous territory in as compact form as practicable.” As we recognized in Matter of Orans (15 N Y 2d 339, 351, supra), these constitutional requirements remain binding although they must be harmonized with the first principle of substantial equality of population among districts.
“Contiguous territory ”, we have said, means “territory touching', adjoining and connected, as distinguished from territory separated by other territory.” (Matter of Sherrill v. O’Brien, 188 N. Y. 185, 207.) The term “compact”, on the other hand, has no precise meaning within the context of the constitutional mandate. Moreover, the Constitution does not provide unqualifiedly for compactness. (Matter of Sherrill v. O’Brien, supra.) At a minimum the Legislature may, in good faith, take account of existing political subdivision lines, topography, means of transportation and lines of communication without violating this standard. (Matter of Sherrill v. O’Brien, supra.) Particularly where cities are concerned, the requirement of practical numerical equality may necessitate boundaries *430 that are ragged at best. Moreover, it is manifest that ouf State, with its irregular boundaries, its islands, rivers, lakes and other geographical features is not susceptible of division into circular planes or squares. Thus, it might be said that the constitutional requirement of compactness is peripheral in its thrust, forbidding a complete departure, yet leaving to the determination and discretion of the Legislature the degree of compactness which is possible in the total representation picture.
But this is not to say that the constitutional requirements of compactness, contiguity and convenience lack vitality. These provisions were adopted for the salutary purpose of averting the political gerrymander and at present are the only means available to the courts for containing that pernicious practice. If the Legislature plays fast and loose with these constitutional requirements, it risks having a districting plan set aside.[4]
Petitioners cite us to numerous examples of allegedly non-contiguous districts, many of which are located on or near bodies of water. However, the requirement of contiguity is not necessarily violated because a part of a district is divided by water. (Matter of Reynolds, 202 N. Y. 430, 442-443; Ince v. Rockefeller, 290 F. Supp. 878.) Moreover, in none of the cited examples is it necessary to travel through an adjoining district to keep within the boundaries of the challenged district.
Similarly, numerous districts are challenged as being non-compact. But as we have noted, the requirement of compactness is a practical one and along with the overriding goal of population equality, numerous factors may legitimately be considered in devising a districting plan. Many of the cited examples, in fact, are patterned after prior districting plans. (See, e.g,, Matter of Orans, 17A N Y 2d.) In sum, although w'e would agree that some of the challenged districts are, to say the least, irregular in form, none ate so aggravated or outrageous as would warrant the conclusion that the Legislature has completely departed from the constitutional standard.
*431 Turning next to petitioners’ equal protection challenge, we conclude that the gerrymandering of special interest groups — racial, social, economic or ideological — is too sensitive and significant an issue to be decided on this record with its bare allegation that “ Chapter 11 * * * constitutes an attempt to maximize the strength of one of the two major political parties by means of a gerrymander Even if we were to assume the justiciability of a gerrymander of a political interest group in the single-member district context, this record does not demonstrate the invidious eifepts of the alleged gerrymander nor does it address the more basic threshold questions such as the necessary size and degree of common interests a group would have to possess before it would be entitled to protection. (Cf. Wright v. Rockefeller, 376 U. S. 52; Fortson v. Dorsey, 379 U. S. 433 ; WMCA, Inc. v. Lomenso, 382 U. S. 4, 5 [Harlan, J., concurring] ; Wells v. Rockefeller, 311 F. Supp. 48, affd. 398 U. S. 901; Whitcomb v. Chavis, 403 U. S. 124, 156, 171, 180 [Douglas, J., dissenting].)
The gerrymander is, concededly, rather deep in the “ political thicket ”. In our judgment, this is not the occasion to venture in and decide whether, and to what extent, the courts ought employ the Equal Protection Clause to police an alleged partisan execution of the judicial command to redistrict.
III
Petitioner Schwartz also contends that the Legislature misapplied the constitutional formula for adjusting the size of the Senate. (N. Y. Const., art. III, §§ 3, 4.)
Readjustment of senatorial representation is accomplished in several stages. First, the total citizen population of the State, as determined by the last Federal census, is divided by 50 — the minimum number of Senate seats. This produces a so-called “ratio” figure. Counties having three or more ratios — i.e., more than 6% of the State’s total citizen population — are then determined and are “allocated” one senatorial seat for each full ratio.[5] The number of senators so allotted to each populous county is then compared with the number given to it in the Con *432 stitution of 1894. The increase, if any, is then added to the 50 original seats to yield the ‘ ‘ whole number’ of senators. Onde the size of the Senate is thus determined, Senate districts are drawn and Senate seats are apportioned in accordance with the equal-population principle. (Reynolds v. Sims, 377 U. S. 533, supra.)
Where a county has been divided after 1894, the computations and comparisons become more complex. The procedure then is to compare the number of senators allotted to thé counties encompassing substantially the same territory as was contained in the original county, with the number of senators given the original county in the Constitution of 1894. At issue here is the proper application of this admittedly complex procedure.
Queens County offers the first illustration. In 1894, Queens had one senator and contained substantially the same territory as is now organized into Queens and Nassau Counties. In computing the increase in the size of the Senate attributable to^the growth of the population in the territory formerly comprising Queens County, the Legislature aggregated the population of Queens (1,987,174) and Nassau (1,428,838) and divided by the ratio figure (364,825). This computation yields nine full ratios. Comparing this figure to the number of senators allocated to Queens in 1894 (one), an increase of eight senators would be indicated. Schwartz contends that the correct procedure is to aggregate the individual full ratios for Queens (five) and Nassau (three) and compare the total of the ratios (eight) to the number of senators allocated in 1894. Thus, an increase of seven senators would be indicated.
In our view, the procedure followed by the Legislature is valid and does not transgress any constitutional provision.
Concededly, in previous apportionments the procedure was to aggregate whole ratios for counties that had been divided after . 1894. (See, e.g., Matter of Fay, 291 N. Y. 198; cf. Matter of Orans, 17A N Y 2d 11, 12.) We discern, however no authority according constitutional stature to this method of computation. Bather, in our view, the Legislature must be accorded some flexibility in working out the opaque intricacies of the constitutional formula for readjusting the size of the Senate. Moreover, where a county has been divided after 1894, the system employed by the Legislature in this case more accurately reflects increases in *433 the population of the territory of the original county — the very basis from which adjustments to the whole number of senators is made. This system is, therefore, consonant with the broad historical objectives underlying the provision for increasing the size of the Senate. (See, e.g., 4 Revised Record of the Constitutional Convention of 1894 of the State of New York, p. 648; Silva, Apportionment in New York, 30 Fordham L. Rev. 581, 614-616.)
Schwartz also contends that the Legislature committed similar error with respect to its computations for Bronx and Westchester Counties.
Bronx County did not exist in 1894, the base year for determining increases in the size of the Senate. It was created by cessions of land from New York County, some of which land New York County had acquired in exchanges with Westchester County. Prior apportionments, however, treated New York and Bronx Counties as a unit and compared it to New York County in 1894 (see, e.g., Matter of Fay, 291 N. Y., at p. 212). The Legislature, recognizing that, in fact, the Bronx as now organized contains 21 square miles formerly a part of Westchester County, adopted a more precise procedure for comparing existing counties to the counties and districts as they existed in 1894.
Thus, the Legislature cumulated the 1970 population of the three existing counties (New York, Bronx, Westchester) and computed 10 full ratios and a major fraction. Comparing this to 1894 when the same territory (then New York and Westchester Counties) had 13 Senate districts, no change was indicated in the size of the Senate.[6]
Schwartz would have the Legislature aggregate the full ratios of present-day Westchester and those portions of the Bronx formerly a part of Westchester. Such a computation would yield three full ratios. Since in 1894 Westchester was allocated only one senator, an increase of two in the whole number of senators would be indicated.
Again, and for the reasons already enunciated, we discern no constitutional infirmity in the legislative method. It is, in our *434 view, a more accurate procedure than heretofore followed. Suf- . fice it to say, the legislative method takes into account that a portion of the Bronx belonged to Westchester in 1894,. that in 1895 New York County annexed parts of Westchester County (L. 1895, ch. 934), and that in 1912 New York County ceded certáin territory, including the territory annexed from. Westchester in 1895, to form Bronx Cpunty (L. 1912, ch. 548).
Under the circumstances, the legislative determination is reasonable and should not be disturbed.
Finally, there is no dispute as to the increase of two senators . attributable to the grouping of Richmond and Suffolk Counties, which under the 1894- Constitution constituted one Senate 'district. The apparent reason is that, in this instance, under either method-^-aggregating of population or aggregating of full ratios —the s.ame result is indicated — an increase of two senators.
IV
We turn next to the alleged violation of the State constitutional requirement that a bill He on the desks of the Legislature for three calendar legislative days prior to its passage. (N. Y. Const., art. III, § 14.)
Section 14 of article III oí the Stale Constitution provides in pertinent part that “No bill shall be passed or become a law unless it shall have been printed and upon the desks of the members, in its final form, at least three calendar legislative days prior to its final passage ’'
The clear purpose of this provision is to prevent hasty and careless legislation, to prohibit amendments at the last moment, and to insure that the proposed legislation receives adequate publicity and consideration. (People ex rel. Hatch v. Reardon, 184 N. Y. 431.)
In the instant case, there was substantial compliance with the letter and spirit of the constitutional requirement. Accordingly, We ought not intervene to nullify this legislative action. (Cf. Finger Lakes Racing Assn. v. New York State Off-Track Pari-Mutuel Betting Comm., 30 N Y 2d 207; People ex rel. Hatch v. Reardon, 184 N. Y. 431, supra.) The bill was originally placed on the legislative desks at 10:00 a.m. on Wednesday, December 15, 1971. Sometime later that day, it was withdrawn for correction of printing errors. The corrected copy of the bill was *435 returned to the legislative desks at about 11:15 p.m. the name day, and the bill was passed three days later, on Saturday, December 18, 1971.[7] With regard to this issue, we also note that the Legislature was meeting in extraordinary session for the single purpose of enacting a legislative reapportionment.
V
The State Constitution states that the latest Federal census shall be “ controlling as to the number of inhabitants in the state or any part thereof ” for purposes of State legislative apportionment. (N. Y. Const., art. III, § 4.) The dispute here is whether correct census data was employed by the Legislature in apportioning the State and whether the petitioner Schwartz should have been allowed discovery of the census data actually used. (CPLR 3120.)
At the time the motion for discovery was pending, the respondents moved for dismissal (CPLR 3211) and for summary judgment (CPLR 3212). Disclosure was thus automatically stayed until the determination of these motions. (CPLR 3214, subd. [b].) Special Term subsequently dismissed the petitions, granted summary judgment declaring chapter 11 to be valid, and denied the motion for discovery. Although the court was free to direct discovery of the census data pending its decision on the motions for dismissal and summary judgment (CPLR 3214, subd. [b]), its failure to do so was not, under the circumstances, an abuse of discretion.
The crux of the petitioner’s substantive objection is that the. Bureau of the Census apparently made corrections to the census data for New York State which were not taken into account by the Legislature.
The fact is, however, that during the fall of 1971, when the Joint Legislative Committee was apportioning and districting the State, it was utilizing corrected 1970 Federal census data — so-called “ third-count ” tabulations. And the record shows that during this period the Joint Legislative Committee and the Bureau of the Census co-operated to insure the accuracy of the committee’s demographic data."
*436 Thus, we conclude that the best available 1970 Federal census data were used and that the constitutional requirement has been satisfied. (N. Y. Const., art. III, § 4; cf. Dunn v. State of Oklahoma, 343 F. Supp. 320, 322 [W. D. Okla.].)
For the reasons stated, the order of the Appellate Division should in all respects be affirmed.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Breitel and Gibson concur.
Order affirmed, without costs.

. A minor county is a county less populous than a ratio. A ratio is the figure obtained by dividing the State’s citizen population by the number of Senate seats (60) or the number of Assembly seats (150).

. This plan divides no so-called “minor” counties or towns in either the Senate or Assembly, and contains a maximum deviation from ^population equality of 11.6% in the Senate and U.5% in the Assembly.

. There may be good reason for treating local government apportionment as a distinct problem. As the court noted in Abate, local legislative bodies have fewer members and local legislative districts have fewer voters than their State and national counterparts. Thus, it may be more difficult to devise apportionment plans that comply with numerical equality at the local level. Furthermore, there are over 80,000 units of local government serving various functions. A certain flexibility may, therefore, be desirable to facilitate intergovernmental co-operation at this level. (See, e.g., Avery v. Midland County, 390 U. S. 474, 485.)

. That such constitutional requirements serve an important purpose was also recognized by the Supreme Court in Reynolds v. Sims (377 U. S., at pp. 578-579), wherein it said: “A State may legitimately desire to * * * provide for compact districts of contiguous territory in designing a legislative apportionment scheme * * * Indiscriminate districting, without any regard for political subdivision or natural or historic boundary lines, may be little more than an open invitation to partisan gerrymandering.”

. This procedure is used merely to compute the increase in the size of the Senate. Additional senators are not actually apportioned to the populous counties in this manner.

. The constitutional formula provides only for upward revisions of the number of senators.

. A calendar day means the time from midnight to midnight. (General Construction Law, § 19.) The law does not recognize fractions of a day. (Aultman & Taylor Co. v. Syme, 163 N. Y, 54, 61.)