OPINION OF THE COURT
WlLMER J. PATLOW, J.
This is a CPLR article 78 proceeding brought by the City of Rochester to recover the sum of $1,625,217.21, plus interest, from the County of Monroe on the grounds that the county’s April, 1981 distribution of retail sales and compensating use tax revenues for the period from Decern *192 ber 1, 1980 through February 28, 1981 was erroneously based upon the 1980, rather than the 1970, Federal census rate.
Petitioner relies upon subdivision (b) of section 1262 of the Tax Law which provides for the disposition of such sales and use taxes (hereinafter sales taxes) as follows: “(b) In the county of Monroe amounts not set aside for county purposes shall be allocated quarterly to the city of Rochester and the area in the county outside the city of Rochester in proportion to their respective populations, determined in accordance with the latest federal census or special population census taken pursuant to section twenty of the general municipal law, completed and published prior to the end of the quarter for which the allocation is made” (emphasis supplied).
Petitioner alleges that by long-standing custom and usage, respondents, as evidenced by their quarterly reports to petitioner have made allocations of sales tax revenues for the following intervals of time: December 1 through February 28-29; March 1 through May 31; June 1 through August 31, and September 11 through November 30.
Petitioner further alleges that the 1980 Federal census figures were not completed and published prior to February 28, 1981, the final day of the quarter in question. Petitioner states that it was not until on or about March 20, 1981 that the United States Department of Commerce issued computer tape population counts in the form of “proof” tables. Petitioner contends that not even these tables are the final publication of census figures inasmuch as they are identified as “advance counts” and contain the following caveats: “The 1980 figures in this publication are subject to change pending the outcome of the various lawsuits dealing with the census counts” and “These ‘proof’ tables and text will be superseded by the formal publication, 1980 Census of Population and Housing, Final Population and Housing Unit Counts, series PHC80-V”.
Petitioner asserts that respondents, in disregard of the explicit language of subdivision (b) of section 1262 of the Tax Law, nonetheless used the 1980 census figures to compute the city’s distributive share of the sales tax revenue for the December 1, 1980 to February 28, 1981 alloca *193 tion period. Inasmuch as the 1980 census recorded a net loss of population for the petitioner City of Rochester, petitioner’s share of the revenues distributed throughout Monroe County dropped from about 41.44% to about 34.42% of the total fund.
According to petitioner, the use of the lower percentage rate as the basis for the April, 1981 distribution covering the December 1, 1980 to February 28, 1981 allocation period resulted in a loss of $1,625,217.21 in sales tax revenues.
On the original return date of the petition, July 22,1981, respondents moved to dismiss on the grounds that the petition failed to state a cause of action and on the further grounds that the court lacked jurisdiction over necessary respondents.
The basis of respondents’ primary jurisdictional argument was that in the event the petition were granted, the county would be required to reallocate the April, 1981 sales tax revenues to all the towns, villages and school districts within Monroe County based upon the 1970 census. Such reallocation, respondents contended, would result in a loss of sales tax revenues to each of these units except the Town of Irondequoit and the Village of East Rochester. Thus, respondents requested that each unit be joined as a necessary party to enable the court to accord complete relief.
Respondents raised an additional jurisdictional issue, namely, the failure of petitioner to serve and name the County Manager as a party respondent.
Following oral argument solely on the primary jurisdictional issue, the court ordered that the 53 towns, villages and school districts throughout Monroe County who shared in the April, 1981 sales tax allocation be joined as parties respondents. Argument on the merits was adjourned to December 14,1981 to permit service upon the newly joined parties.
On December 14, 1981 respondents County of Monroe and Monroe County Real Property Tax Service Agency moved for permission to amend their answer nunc pro tunc to assert cross claims against the respondent towns, vil *194 lages and school districts, and, further, for summary judgment on those cross claims, declaring the rights of the parties.
The Town of Irondequoit has answered the petition and asserted a cross claim against respondents County of Monroe and Monroe County Real Property Tax Service Agency for an increase of $7,449.78 in its distributive share based on the 1970 census data.
The remaining towns, except Parma, have joined in an answer to the petition. Additionally, the Towns of Chili, Greece, Henrietta, Mendon, Ogden, Penfield, Perinton and Pittsford have submitted opposition to the county’s motion and/or answered its cross claims.
All of the villages except East Rochester and Fairport, have jointly interposed an answer to the petition and cross claims. The Village of Hilton has interposed a separate answer to the petition and cross claims, as well as a supporting affidavit.
Finally, the respondent school districts, with the exception of Avon, Holley and Wayne School Districts, have submitted a joint answer to the petition and an affidavit in opposition to the county’s motion to amend. These school districts have also joined in a motion to dismiss the petition on the grounds, inter alia, that it fails to state a cause of action as to them.
On December 14, 1981, the court heard argument by counsel for any party wishing to be heard on the merits of the petition. Argument on the secondary issues raised in connection with the county’s cross claims was deferred.
Addressing the merits of the petition, the county respondents contend that the April, 1981 distribution was calculated in accordance with the same quarterly allocation system in use by the county since 1965, and under which the city had consistently accepted payment.
According to respondents, the quarterly periods outlined by petitioner are the vending reporting quarters (beginning Dec. 1, March 1, June 1 and Sept. 1) and, as such, must be distinguished from the collection quarters (beginning Jan. 1, April 1, July 1 and Oct. 1) during which the sales tax revenues are collected by the State; and the cash receipt *195 quarters (beginning Feb. 1, May 1, Aug. 1 and Nov. 1) during which the county receives cash distributions from the State for ultimate disbursement to the City of Rochester and the towns, villages and school districts within Monroe County.
It is the respondents’ position that “the quarter for which the allocation is made” within the meaning of subdivision (b) of section 1262 of the Tax Law is the county’s cash receipt quarter, since it is during this quarter that the county actually receives the net final amount of sales tax revenues available for disbursement. This net final amount represents moneys from the immediately preceding vendor reporting quarter only in part, as it may also include adjustments for underpayments or overpayments from prior vendor reporting periods.
Respondents additionally assert that even if the vendor reporting quarter of December 1, 1980 through February 28, 1981 is applicable, the 1980 census was completed and published for purposes of subdivision (b) of section 1262 of the Tax Law prior to the end of that quarter. Specifically, respondents point to the “Local Official Review Counts” released by the United States Census Bureau June 26, 1980, the preliminary population counts released September 13,1980 (Census Bureau Document No. D-324) and the “Preliminary Report” (PHC80-P-34) published in February, 1981, all issued prior to the end of the quarter.
Attached to the county’s moving papers is an affidavit of the Acting Director of the Bureau of the Census who states that at the time of the September, 1980 publication, the Census Bureau had closed its local offices in the Monroe County area, had completed its follow-up visits to vacant houses and to nonresponding housing units, and had completed its hand count of the populations of each town, village and city within the county. He further states that preliminary counts, which includes the September, 1980 and February, 1981 releases, differ from final counts only in that final counts are obtained from computer processing of the questionnaires. Finally, he states that the March 20, 1981 release consisted of an “Advance Report” and “P.L. 94-171 Counts” which are final counts, subject only to litigation. Significantly, respondents point out in further *196 support of their position, that the population count for the City of Rochester was 241,509 in September of 1980, 241,539 in February of 1981 and 241,741 in March of 1981, a variance which they characterize as minimal and inconsequential.
The court notes that to date no party has submitted any documents which would indicate that the census data for New York State released by the Bureau of Census in March, 1981 have in fact been superseded.
Succinctly stated, in order for petitioner to prevail, it must be determined, pursuant to subdivision (b) of section 1262 of the Tax Law, that:
(1) The vending reporting quarter ending February 28, 1981, is “the quarter for which the allocation is made”, and
(2) The 1980 Federal census was not “completed and published” prior to February 28, 1981.
Thus, the question of when the 1980 Federal census was “completed and published” for purposes of subdivision (b) of section 1262 of the Tax Law is of prime consideration.
At the outset, a review of judicial authority is appropriate.
Perhaps closest to the case at bar on its facts, and most relevant because of its detailed and well-reasoned analysis, is the case of City of Detroit v State Comr. of Revenue (330 Mich 239).
There, the Supreme Court of Michigan was called upon to construe certain State constitutional and statutory provisions for the distribution of a sales tax to local governmental units by the State. The distribution was to be on a population basis according to the “last State-wide Federal census”. Both Constitution and statute also approved the use of any later, special Federal county-wide census for purposes of intracounty distributions.
In construing these provisions, the court forthrightly stated (supra, p 248) “when ascertainable, legislative intent is the guiding star.”
The court elaborated as follows (p 249): “The controlling question here may not be so narrowly stated as to be simply, ‘At what date can it be said there is a new Federal *197 decennial census?’, but, rather, our inquiry must be, ‘What did the people mean, in adopting article 10, § 23, by the provision that the return of sales-tax moneys to local units shall be on a population basis and that the computation of such population shall be based on the last State-wide Federal census?’, and, further, ‘What was the legislative intent expressed by the provision in PA 1949, No 308, that distribution of the intangible-tax moneys to local units shall be upon a per capita basis according to the latest or each succeeding Federal decennial census?’ ”
Noting the constitutional and legislative provisions for use “not only of the latest Federal State-wide or decennial census, but also of any later special Federal county-wide census for distribution within a county” (330 Mich, at pp 249-250), the court found “a clear intent that returns or distributions should be made on a basis as nearly in accord with actual population as possible” (supra, p 250; emphasis supplied).
The court continued (pp 250-251): “There is no indication of an intent to fix some arbitrary basis, utterly unrelated to need or use, for the distribution of these tax moneys. The distributions and returns were intended to serve the purpose of helping to finance the operations of local governmental units in proportion to their respective needs, it being thought, apparently, that the expense of such operations would bear some direct relationship to the actual population in each of the units at the time such expenses were being incurred * * * To accomplish that purpose, it is provided that such distributions shall be geared to Federal enumerations; but there is no indication of an intent that the proportionate amounts thereof to the respective units shall be affected by the determination of federal officialdom of the time for promulgation of census results.”
On the basis of this finding of legislative intent, the court in City of Detroit v State Comr. of Revenue (330 Mich 239, supra) rejected the contention that the change in population status could be given effect no earlier than the date of the final, official census bulletin.
Numerous courts in jurisdictions other than New York State have construed language similar to “latest federal census” as set forth in subdivision (b) of section 1262 of the *198 Tax Law to include census data which is preliminary and subject to correction, so long as it is officially promulgated. To this effect are Holcomb v Spikes (232 SW 891 [Tex]), Herndon v Excise Bd. of Garfield County (147 Okla 126), Ervin v State (119 Tex Crim App 204), Ford v Owens (160 SC 168), Excise Bd., Washita County v Lowden (189 Okla 286) and Cahill v Leopold (141 Conn 1, overruled on other grounds by Butterworth v Dempsey, 229 F Supp 754, affd 378 US 562, affd & remanded 378 US 564).
In Cahill v Leopold (supra), the question presented was the meaning of the phrase “completion of a census” as set forth in a State constitutional amendment providing for reapportionment of State legislative districts. The court rejected the notion that the information had to be published in book form, and even that the figures had to be final. Instead, the court defined the completed census as (p 10) the “one showing the figures which are essential for intelligent action on the part of the General Assembly”.
In Holcomb v Spikes (supra, p 895) it was noted that the mere fact an official preliminary count was labeled “subject to correction” was not evidence that it was incomplete, incorrect, negligently done or not a public document under law.
In Ford v Owens (supra, p 171) the word “published” in the phrase “last preceding published United States Census” was not taken to mean the final, official report of the Bureau of the Census as compiled and bound in certain volumes, but rather “its usual general meaning, which is thus given by Webster: ‘To make public; to make known to people in general * * * to make public in a newspaper, book, circular, or the like.’ ” (160 SC, at p 177.)
Although there appears to be no New York State judicial authority addressing the precise issue at bar, the decision of the New York State Court of Appeals in Matter of Schneider v Rockefeller (31 NY2d 420) is not inconsistent with the above-cited opinions.
In Matter of Schneider v Rockefeller (supra), the court considered language in section 4 of article III of the New York State Constitution stating that the latest Federal census shall be controlling for purposes of State legislative *199 apportionment “in so far as such census and the tabulation thereof purport to give the information necessary therefor.” The court held (31 NY2d, at pp 435-436) that the constitutional requirement was satisfied by the use of “corrected 1970 Federal census data — so-called ‘third-count’ tabulations” as such was the “best available” to the joint legislative committee in the fall of 1971.
The court is aware of judicial precedents to the effect that “publication” of the “last Federal census” means final, formal, official publication and does not include preliminary counts, most notably Childers v Duvall (69 Ark 336) and Haralson v State ex rel. King (260 Ala 473; 43 ALR2d 1343).
The Childers decision, however, is an earlier precedent which the later cases have distinguished or declined to follow (see Holcomb v Spikes, 232 SW 891, 894 [Tex], supra; Herndon v Excise Bd. of Garfield County, 147 Okla 126, 128, supra; and Cahill v Leopold, 141 Conn 1, 16, supra; contra Carpenter v Board of Apportionment, 218 Ark 404).
The Haralson opinion cited with approval and reaffirmed the rationale of City of Detroit v State Comr. of Revenue (330 Mich 239, supra) that constitutional and legislative intent must be the controlling factors (43 ALR2d 1343, 1350-1351). However, the Haralson court construed the statutory term “publication” to mean final census data because of a subsequent amendment to the statute which clarified the legislative intent (id., pp 1345-1349).
The court is also aware of, but declines to follow, certain nonbinding opinions of the New York State Comptroller which hold that the phrase “latest federal census * * * completed and published” within subdivision (b) of section 1262 of the Tax Law, was intended to refer to the latest certified Federal census figures (Opns St Comp, 1981, p 36, citing Opns St Comp, 1971, No. 71-558, unreported).
To adopt the Comptroller’s opinions would be to write into the statute an additional requirement, namely, certification, which the Legislature could have inserted had it so intended. Additionally, the 1981 opinion cautions that *200 final certification would have to await completion of pending litigation. In the court’s opinion, this creates an untenable delay in utilizing the new census, a result which the Legislature could not possibly have intended.
In the absence of an explicit expression of intent by the New York State Legislature as to the meaning of the phrase “latest federal census * * * completed and published” for purposes of subdivision (b) of section 1262 of the Tax Law, this court adopts the reasoning set forth in City of Detroit v State Comr. of Revenue (supra) and finds that the legislators intended an interpretation which would permit the use of statistics which reflect actual population as nearly as possible.
This finding is buttressed by the fact that here, as in City of Detroit v State Comr. of Revenue (supra), the statutory scheme provides for utilization of special, later censuses under certain circumstances. Indeed, subdivision (b) of section 1262 of the Tax Law permits use of special population censuses at intervals of no less than two years, a clear indication that the Legislature intended the use of the most current population figures.
Furthermore, the Legislature has, in other instances where it deemed appropriate, expressly described the “latest federal census” as that which was “published as a final population count by the United States bureau of the census” (emphasis supplied; see General Construction Law, § 37-b; State Finance Law, § 54). The failure of the Legislature to include such descriptive language in subdivision (b) of section 1262 of the Tax Law is taken by this court to indicate an intention not to require the use of such final census data for sales tax distribution purposes.
Finally, as recently as 1981, the Legislature declined the clear opportunity to specify the use of “final” or “certified” census data when adopting provisions for a similar distribution of revenues to villages within Albany County (see Tax Law, § 1262-d). Instead, they choose language identical to that of subdivision (b) of section 1262 of the Tax Law, indicating continuing approval.
Thus, the court concludes, in accordance with Cahill v Leopold (141 Conn 1, supra) and other decisions previously cited, that the 1980 Federal census was “completed” within *201 the meaning of subdivision (b) of section 1262 of the Tax Law at such time as it provided the information essential for intelligent action by those who would use it. As suggested in Matter of Schneider v Rockefeller (31 NY2d 420, supra), the census data need not be final so long as it is the “best available” for its purpose.
The court further concludes that the 1980 census was “published” within the meaning of the statute in question at such time as it was officially promulgated (see, e.g., Holcomb v Spikes, 232 SW 891 [Tex], supra). There is no doubt that the Federal legislation authorizing the census provides for the publication and distribution of preliminary as well as final reports and bulletins (see US Code, tit 13, § 7).
On the basis of all of the foregoing, the court determines that the “Preliminary Report” entitled “1980 Census of Population and Housing, New York” issued by the Bureau of the Census in February, 1981 qualifies as a Federal census “completed and published” for purposes of subdivision (b) of section 1262 of the Tax Law. This document displays on its face the identifying number PHC80-P-34 and states that it is “For Sale by the Bureau of the Census and U.S. Department of Commerce District Offices, 70 cents”.
It is unnecessary, in view of this determination, for the court to consider precisely which calendar quarter the Legislature intended by the phrase “quarter for which the allocation is made” in subdivision (b) of section 1262 of the Tax Law.. Even if the vending reporting period (Dec. through Feb.) is correct, as asserted by the city, the February, 1981 “Preliminary Report” would still be “completed and published prior to the end of the quarter for which the allocation is made” within the meaning of the statute.
Nevertheless, the court notes in this regard “ ‘[i]t is well settled that the construction given statutes and regulations by the agency responsible for their administration, if not irrational or unreasonable, should be upheld.’ ” (Matter of Bernstein v Toia, 43 NY2d 437, 448.) Under the constraints of this authority, respondents’ selection of the cash receipt quarter (Feb. through March) cannot be disturbed.
*202 Therefore, the county’s April, 1981 distribution of sales tax revenues based upon the 1980 Federal census figures was not arbitrary or capricious or affected by an error of law, and consequently the petition of the City of Rochester is hereby dismissed.
In passing, the court notes that in order to have reached the merits of the petition, it necessarily rejected respondents’ contention that jurisdiction was defective for failing to name and serve the County Manager as the proper party respondent.
It is regrettable that petitioner city, faced with shrinking population and an eroding tax base on the one hand, and increased expenditures as well as inflationary pressures on the other, is destined to receive an ever decreasing share of the sales tax revenue with each succeeding census. However, as long as population remains the sole criterion for the distribution of sales tax funds, this result is inevitable. The solution to the petitioner city’s dilemma lies not with the courts, but with a legislative change in the distribution formula.