Titone, J.
(dissenting). The issue here is, quite simply, the degree to which our State constitutional antigerrymandering provisions still have vitality in light of the evolving body of Federal law that both demands proportional representation (see, e.g., Mahan v Howell, 410 US 315; Reynolds v Sims, 377 US 533) and prohibits State apportionment plans that dilute minority voting strength (42 USC § 1973 [a], [b]; see, Thorn-burg v Gingles, 478 US 30). The majority has held that in this case the former must give way to the values reflected by the latter. Since I conclude that it is possible under these facts to reconcile the requirements of Federal law with those of article III, § 4 of our State Constitution without completely eviscerating the latter, I dissent.
Article III, §4 of the State Constitution requires, among other things, that Senate district lines be drawn so that "no *81 county shall be divided * * * except to make two or more [S]enate districts wholly [within the] county.” It has long been recognized that absolute adherence to this constitutional command is impossible in light of modern Federal equal-populotian mandates and the existence of several counties whose populations are insufficient to support even a single senatorial district. Accordingly, this Court has held that the Constitution is satisfied when "the Legislature has made a good-faith effort to comply with * * * the equal-population principle * * * and has not unduly departed from our State constitutional command that the integrity of counties be preserved” (Matter of Schneider v Rockefeller, 31 NY2d 420, 428-429 [emphasis supplied]).
The standard for judicial review in this context is thus one akin to the notion of reasonableness. Under Schneider, what appears to be an unconditional constitutional directive may be satisfied as long as any departures therefrom are fairly justifiable in view of the other legal and practical constraints to which the redistricting process is subject. Hence, while the strict county-integrity rule has been eased by precedent, the Legislature is not free to disregard it simply because it can point to other, legally sanctioned goals as the motivating force or benign motive behind its final product. And, contrary to the majority’s suggestion, the Legislature is not the sole arbiter of whether an appropriate balance has been struck between the strictures of that rule and the sometimes competing values of population equality and enhancement of minority voting strength. As important and deserving as those values unquestionably are, the Legislature is duty-bound to accommodate them within our own constitutional framework, and the courts have both the right and the obligation to ensure that the demands of the State Constitution are, to the extent practicable, respected (Matter of Sherrill v O’Brien, 188 NY 185, 203-204; see Matter of Schneider v Rockefeller, supra, at 427 ["(o)ur duty is * * * to determine whether the legislative plan substantially complies with the * * * State Constitution”]). Viewed against these principles, the redistricting plan at issue here cannot be upheld.
The plan petitioners have challenged contains 28 out of a total of 61 Senate districts that cross county lines other than to create two or more districts wholly within the divided counties. A total of 11 minor and 12 major counties have been divided. Populous Kings and New York Counties are each divided by no less than three districts. Bronx County, which *82 has sufficient population to encompass four whole Senate districts, is instead given only two wholly intra-county districts and is then divided by four additional cross-county districts. Moreover, the plan contains four bi-county districts, i.e., pairs of districts where both contain parts of the same two counties, a phenomenon which, according to petitioners, is unprecedented. Thus, it cannot be disputed that the challenged plan represents a drastic departure from the constitutional goal of respecting the integrity of county lines.
Contrary to the majority’s analysis this derogation of the constitutional rule cannot be justified on the basis of the competing commands of the Federal equal-population requirement and the Voting Rights Act. As revealed by petitioners’ submissions, at least four alternative plans exist that satisfy all of the requirements of Federal law while dividing fewer counties and containing no bi-county districts. These plans establish that the Legislature’s county-dividing choices were not dictated by practical necessity.
Respondents’ efforts to combat the inferences to be drawn from the existence of these less divisive alternative plans are unavailing. First, relying on language in Matter of Schneider v Rockefeller (supra, at 427), respondents contend that the existence of alternative plans is not sufficient to overcome the presumption of constitutionality that ordinarily cloaks legislation and is, in fact, not even a proper subject for judicial consideration. The argument, however, misconstrues the Schneider analysis, which merely concluded that "it is not [the court’s] function to determine whether a plan can be worked out that is superior to that set up by [the challenged plan]” (id., at 427). Here, the alternative plans were not submitted as alternative or superior plans, but rather as a means of disproving respondents’ contention that the Legislature’s wholesale disregard for county integrity was compelled by the need to comply with Federal equal protection principles. Viewed in that context, the alternative plans provide a legitimate and, indeed, highly persuasive argument for holding the enacted plan unconstitutional.
Respondents next contend that the alternative plans petitioners submitted are an unsatisfactory ground for invalidating the enacted plan because although all four of them satisfy Federal requirements, they each contain average population deviations that are higher than the over-all percentage devia *83 tian contemplated by the enacted plan. In Reynolds v Sims (supra, at 577, 579), the Supreme Court set down the basic principle that local legislators should be elected from districts that are "as nearly of equal population as is practicable,” but also stated that some "deviations” "based on legitimate considerations incident to the effectuation of * * * rational state policy” are permissible. On the basis of Reynolds and its progeny, this Court held in Matter of Schneider v Rockefeller (supra, at 428) that the Legislature is entitled to draw districts that cross county lines in order to minimize deviations from the one-person-one-vote principle and that "the choice of maximum population equality [is] a [valid] guiding principle.” Respondents invoke the latter pronouncement in support of their contention that the Legislature was entitled to adopt a plan that was more divisive than the alternatives because they were acting to advance the goal of minimizing population deviations. The argument is, at best, misguided.
Since Schneider was decided, the United States Supreme Court has held that a "rational state policy of respecting the boundaries of political subdivisions” is a valid ground for departing somewhat from the strict one-person-one-vote rule and that a "16-odd percent maximum deviation” was within "tolerable limits” (Mahan v Howell, 410 US 315, 328-329, supra). Mahan thus establishes that compliance with Federal law may be achieved even though the redistricting plan does not purport to minimize population deviations, as long as some other satisfactory State value, including preserving the integrity of local political subdivisions, was the motivating reason (accord, Brown v Thomson, 462 US 835; White v Regester, 412 US 755; Gaffney v Cummings, 412 US 735). Additionally, Mahan refutes any argument respondents might make that they had to ignore county borders to the extent they did in order to comply with Federal law.
Furthermore, inasmuch as Schneider predates Mahan, that case can no longer be regarded as controlling to the extent that it suggests judicial tolerance for redistricting plans that freely divide counties in order to maximize population equality. Now that Mahan has established that Federal law does not require State Legislatures to maximize equality without regard to other local concerns, the Court’s view of what constitutes an "undue” incursion on the county-integrity prin *84 ciple must necessarily change.[1] In the final analysis, the guiding principle continues to be the prescriptions contained in the State Constitution, and those prescriptions must be obeyed except to the extent that they are directly in conflict with the dictates of Federal law.
Finally, respondents’ reliance on the Federal Voting Rights Act to justify the Legislature’s departure from article III, § 4’s requirements is unpersuasive. While the Legislature was unquestionably required to guard against an apportionment plan that could dilute the voting strength of minority voters, respondents have not shown in specific terms how that goal necessitated the number and extent of county divisions that were adopted here.
In short, because the plan the Legislature adopted departs dramatically from State constitutional mandates and was not necessitated by Federal law, petitioners have made a prima facie showing that the Senate redistricting plan "unduly departed from our State constitutional command that the integrity of counties be preserved” (Matter of Schneider v Rockefeller, supra, at 428-429). Further, that constitutional command is not merely an outdated relic of another time that may be relegated to a secondary status or even disregarded entirely in light of modern Federal principles. Article III, § 4 was designed specifically to prevent "the possibility of unfair division of the State into * * * districts] so as to result in party or individual advantage” (Matter of Sherrill v O’Brien, supra, at 203; see, 3 Lincoln, Constitutional History of New York, at 135, 204, 218). That concern is as valid today as it was just before the turn of this century, when the Constitution of 1894 containing the present provision’s predecessor was adopted (see, McKinney’s Cons Laws of NY, Book 2, NY Const, art III, § 4, Historical Note, at 40). Indeed, even a brief review of the challenged plan’s treatment of Bronx County makes clear that the practice of gerrymandering is far from a dead letter.
With a population of 1,203,789, Bronx County is entitled to four wholly contained Senate districts. If the Legislature had drawn four whole Senate districts wholly enclosed within the *85 County’s borders, the percentage deviation from a perfect one-person-one-vote ratio would be only 2%, a figure well within the "tolerable limits” contemplated in Mahan v Howell (supra). Furthermore, the ethnic make-up of the Bronx readily lends itself to district formation that would advance the values to be promoted by the Voting Rights Act. With a population that is 43% Hispanic, 31% African-American and 26% white, Bronx County could accommodate two wholly contained districts that are nearly 85% combined minority with a majority of Hispanics, one district that is nearly 85% combined minority with a majority of African-Americans and one district that would contain most of the County’s non-minority population. The fact that the Legislature chose to criss-cross the County’s borders repeatedly, giving it only two intra-county Senate districts and dividing the remainder of its population among four inter-county Senate districts belies any serious claim that the present redistricting plan was motivated solely by a legislative desire to comply with Federal mandates.
I am particularly concerned that the tolerance the majority has today expressed for a plan that all but disregards the integrity of county borders will be read by many as a signal that our State constitutional provisions no longer represent serious constraints on the critically important redistricting process. Certainly, although the majority has made passing reference to " 'the historic and traditional significance of counties in the districting process’ ” (majority opn, at 77, quoting Matter of Orans, 15 NY2d 339, 352, supra), there is little in its analysis or result that suggests any real commitment to that principle. Inasmuch as I deem this constitutionally prescribed principle to be important to the integrity of our redistricting system and inasmuch as the principle could have been accommodated within a Federally satisfactory plan, I am compelled to dissent from the Court’s decision to uphold the plan the Legislature enacted and vote instead to affirm the judgments below.[2]
*86 Judges Simons, Hancock, Jr., and Bellacosa concur with Chief Judge Wachtler; Judge Titone dissents and votes to affirm in a separate opinion; Judge Kaye taking no part In each case: Judgment reversed, etc.

. Respondents’ reliance on Bay Ridge Community Council v Carey (103 AD2d 280, affd 66 NY2d 657) as a post-Mahan decision that supports their position is misplaced, since Bay Ridge was concerned principally with Assembly districts, as to which there is no effective constitutional rule requiring respect for county lines (see, 103 AD2d, at 285, citing Matter of Orans, 15 NY2d 339, 351).

. Inasmuch as the Senate plan and the Assembly plan were enacted as part of the same law, the farmer’s constitutional infirmity operates to invalidate the latter as well (see, Matter of Orans, 15 NY2d 339, supra).