Matter of Harkenrider v Hochul (2022 NY Slip Op 02648)

Matter of Harkenrider v Hochul

2022 NY Slip Op 02648

Decided on April 21, 2022

Appellate Division, Fourth Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on April 21, 2022
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: WHALEN, P.J., CENTRA, LINDLEY, CURRAN, AND WINSLOW, JJ.

430 CAE 22-00506

[*1]IN THE MATTER OF TIM HARKENRIDER, GUY C. BROUGHT, LAWRENCE CANNING, PATRICIA CLARINO, GEORGE DOOHER, JR., STEVEN EVANS, LINDA FANTON, JERRY FISHMAN, JAY FRANTZ, LAWRENCE GARVEY, ALAN NEPHEW, SUSAN ROWLEY, JOSEPHINE THOMAS AND MARIANNE VOLANTE, PETITIONERS-RESPONDENTS,
v
GOVERNOR KATHY HOCHUL, LIEUTENANT GOVERNOR AND PRESIDENT OF THE SENATE BRIAN A. BENJAMIN, SENATE MAJORITY LEADER AND PRESIDENT PRO TEMPORE OF THE SENATE ANDREA STEWART-COUSINS, SPEAKER OF THE ASSEMBLY CARL HEASTIE, NEW YORK STATE LEGISLATIVE TASK FORCE ON DEMOGRAPHIC RESEARCH AND REAPPORTIONMENT, RESPONDENTS-APPELLANTS, ET AL., RESPONDENT.

LETITIA JAMES, ATTORNEY GENERAL, ALBANY (JEFFREY W. LANG OF COUNSEL), FOR RESPONDENTS-APPELLANTS GOVERNOR KATHY HOCHUL, LIEUTENANT GOVERNOR AND PRESIDENT OF THE SENATE BRIAN A. BENJAMIN.
CUTI HECKER WANG LLP, NEW YORK CITY (ALICE REITER OF COUNSEL), FOR RESPONDENTS-APPELLANTS SENATE MAJORITY LEADER, PRESIDENT PRO TEMPORE

 Appeals from a judgment (denominated order) of the Supreme Court, Steuben County (Patrick F. McAllister, A.J.), entered March 31, 2022. The judgment, inter alia, granted petitioners declaratory and injunctive relief. 
It is hereby ORDERED that the judgment so appealed from is modified on the law by denying the amended petition insofar as it sought declaratory and injunctive relief on the ground that the 2022 congressional and state senate maps were unconstitutionally enacted by the legislature, vacating the 3rd, 6th, 8th, 9th, 11th, 12th and 13th decretal paragraphs, deleting the word "void" from the 5th decretal paragraph and substituting the word "unconstitutional," and as modified the judgment is affirmed without costs and the matter is remitted to Supreme Court, Steuben County, for further proceedings in accordance with the following memorandum: Petitioners commenced this special proceeding pursuant to article III, § 5 of the New York State [*2]Constitution and McKinney's Unconsolidated Laws of NY § 4221 (L 1911, ch 773, § 1) seeking judicial review of the recent reapportionment and redistricting by the legislature based on the 2020 federal census. Following a bench trial, Supreme Court granted petitioners declaratory and injunctive relief on the ground that the 2022 congressional, state senate, and state assembly maps were unconstitutionally enacted by the legislature and, alternatively, determined that the 2022 congressional map failed to comply with the substantive requirements of article III, § 4 (c) (5) of the New York State Constitution. Although not challenged by petitioners in the amended petition, the court determined that the assembly plan had been enacted through the same unconstitutional process, and thus declared that plan void, as well as the state senate and congressional plans. Respondents-appellants (respondents) appeal.
In 2014, New York amended article III, § 4 of its Constitution by, inter alia, redefining the process of preparing redistricting plans for consideration, and possible enactment, by the legislature and by restructuring and adding to the principles to be used in the creation of state senate, state assembly, and congressional districts, i.e., in the drawing of new district maps. Those amendments were also enacted into statute in Legislative Law § 93 (as amended by L 2012, ch 17). The 2020 census provided the first opportunity to put the 2014 constitutional amendments into practice.
The 2014 amendments created an independent redistricting commission (IRC) tasked with preparing a "redistricting plan to establish senate, assembly, and congressional districts" (NY Const, art III, § 4 [b]; see Legislative Law § 93). The IRC was required to submit to the legislature its first redistricting plan and implementing legislation "on or before January first or as soon as practicable thereafter but no later than January 15 [, 2022]" (NY Const, art III, § 4 [b]). The legislature was then required to vote on the plan without amendment (see id.). If, inter alia, the legislature failed to approve the first redistricting plan, the IRC was required, within 15 days of notification of that failure and in no case later than February 28, to "prepare and submit to the legislature a second redistricting plan and the necessary implementing legislation" (id.). The legislature would then vote on that second plan without amendment (see id.). If the legislature failed to approve the legislation implementing the second redistricting plan from the IRC, "each house shall introduce such implementing legislation with any amendments each house of the legislature deems necessary" (id.).
Here, the IRC submitted its first redistricting plan on January 3, 2022, before its January 15 deadline. Because the IRC had been deadlocked, however, it submitted the two plans that had garnered equal IRC support (see NY Const, art III, § 5-b [g]). The legislature rejected both plans. Thereafter, the IRC remained deadlocked and failed to submit a second redistricting plan by its deadline. As a result, the legislature drafted and enacted its own redistricting plans for the state senate, state assembly, and congress. Petitioners challenged the congressional and state senate plans as unconstitutional on procedural and substantive grounds. The court agreed with petitioners and determined that those plans were unconstitutionally enacted by the legislature and, alternatively, that the 2022 congressional map failed to comply with the substantive requirements of article III, § 4 (c) (5) of the New York State Constitution. The court also, sua sponte, determined that the unchallenged state assembly map was unconstitutionally enacted by the legislature.
As a threshold matter, we conclude that, contrary to the contention of certain respondents, petitioners have standing to seek review of the legislature's redistricting plans. Article III, § 5 of the New York State Constitution expressly provides for judicial review of a redistricting plan upon a petition brought by "any citizen" (see Uncons Laws § 4221; see also Wright v County of Cattaraugus, 41 AD3d 1303, 1304 [4th Dept 2007]).
We agree with respondents, however, that the court erred in concluding that the process used by the legislature to enact the 2022 maps was unconstitutional and therefore that the implementing legislation is void. "A statute enjoy[s] a strong presumption of constitutionality . . . [and,] [t]o rebut that presumption, the party attempting to strike down a statute as facially unconstitutional bears the heavy burden of proving beyond a reasonable doubt that the statute is in conflict with the Constitution" (People v Viviani, 36 NY3d 564, 576 [2021] [internal quotation marks omitted]; see Overstock.com, Inc. v New York State Dept. of Taxation & Fin., 20 NY3d 586, 593 [2013], cert denied 517 US 1071 [2013]; Cohen v Cuomo, 19 NY3d 196, 201-202 [2012]). A law will be deemed unconstitutional "only as a last unavoidable result . . . after every [*3]reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible" (White v Cuomo, — NY3d &mdash, 2022 NY Slip Op 01954, *4 [2022] [internal quotation marks omitted]). "[R]eapportionment is within the legislative power with the exercise thereof being subject to constitutional regulation and limitation" (Matter of Orans, 15 NY2d 339, 352 [1965], appeal dismissed 382 US 10 [1965]).
We conclude that the New York State Constitution is silent as to the appropriate procedure to be utilized in the event that the IRC fails to submit a second redistricting plan to the legislature as constitutionally directed, and we thus conclude that the legislation used to fill the gap in that procedure is not unconstitutional and that the redistricting maps enacted by the legislature pursuant to that legislation are not void ab initio. The legislature had proposed amendments to article III of the Constitution providing that, "[i]f the [IRC] does not vote on any redistricting plan or plans, for any reason, by the date required for submission of such plan by this article, the [IRC] shall submit to the legislature all plans in its possession, both completed and in draft form, and the data upon which such plans are based" (2019 NY Senate Bill S8833; see 2021 NY Senate Bill S515). Thus, if the IRC failed to submit a plan by its deadline, it would produce its draft materials to the legislature, and the legislature would begin the process of making "any amendments [to the implementing legislation] each house of the legislature deems necessary" per the original 2014 amendments, subject to certain drafting principles (NY Const, art III, § 4 [b]). That proposed amendment was submitted to the voters in 2020 as part of a larger package of amendments, but did not pass. Therefore, in order to remedy the procedural gap, the legislature enacted a legislative amendment (L 2021, ch 633, § 1) that expressly authorized it to enact redistricting plans, if the IRC failed to act, in the same way as if the IRC had submitted a second plan that the legislature rejected.
The court appears to have agreed with petitioners that, because article III, § 4 (e) provides that the IRC process outlined in § 4 (b) "shall govern" redistricting, the legislature lacked authority to act independently in the absence of the submission of a second redistricting map by the IRC. Nothing in the Constitution, however, including subdivisions 4 (b) and 4 (e) of article III, expressly prohibits the legislature from assuming its historical role of redistricting and reapportionment if the IRC fails to complete its own constitutional duty (see generally Orans, 15 NY2d at 352). "[G]iven the Constitution's silence on th[at] issue and [the] recognition that the [l]egislature must be accorded a measure of discretion in [redistricting] matters" (Cohen, 19 NY3d at 202), we conclude that petitioners failed to meet their burden of establishing that the legislature's enactment of legislation (L 2021, ch 633, § 1) in order to fill a procedural gap was inconsistent with or impermissible under the Constitution. Moreover, the Constitution permits the legislature to reject the IRC's second redistricting plan and implement its own plan "with any amendment each house of the legislature deems necessary" (NY Const, art III, § 4 [b]). Thus, the legislature's exercise of its historically recognized redistricting authority upon the failure of the IRC to complete its constitutionally appointed tasks is consistent with Constitutional intent and is not "a gross and deliberate violation of the plain intent of the Constitution and a disregard of its spirit and the purpose for which express limitations are included therein" (Matter of Sherrill v O'Brien, 188 NY 185, 198 [1907]; see Cohen, 19 NY3d at 202). The court therefore erred in determining that the process used to enact the 2022 redistricting maps was unconstitutional and that the congressional, state senate, and state assembly redistricting plans were therefore void ab initio. Consequently, the court further erred in granting various relief based upon that determination, such as granting injunctive and declaratory relief and ordering that the legislature draft new maps with bipartisan support. We therefore modify the judgment accordingly. We note that the court's erroneous determination that the legislature violated the Constitution in enacting the redistricting plans was the sole basis for invalidating the state senate and assembly plans, which themselves were not found unconstitutional. In light of our determination, we do not reach respondents' alternative contention that the court erred in sua sponte declaring the assembly map void.
Contrary to respondents' further contention, however, we agree with petitioners and the court that the congressional map was unconstitutional in that it violated article III, § 4 (c) (5), which provides as relevant here that "[d]istricts shall not be drawn to discourage competition or for the purpose of favoring or disfavoring incumbents or other particular candidates or political parties." As with the procedural issue, petitioners bore the initial burden on this issue of establishing beyond a reasonable doubt that the 2022 congressional map conflicts with the Constitution (see Viviani, 36 NY3d at 576; Cohen, 19 NY3d at 201-202). Although that is a [*4]heavy burden, the terms of article III, § 4 (c) (5) prohibit the discouragement of competition or the drawing of districts in order to favor one party over the other, which permits no level of intentional discouragement of competition or partisan favoritism (see generally In re Senate Joint Resolution of Legislative Apportionment 1176, 83 So3d 597, 617 [Fl Sup Ct 2012]). In evaluating whether a party has established unconstitutional partisan gerrymandering as a factual matter beyond a reasonable doubt, "[c]ourts have found that direct or circumstantial evidence may establish that a districting plan was drawn" with partisan intent (League of Women Voters of Ohio v Ohio Redistricting Commn., — NE3d &mdash, 2022 WL 110261, *24 [Ohio Sup Ct, Jan. 12, 2022, Nos. 2021-1193, 2021-1198, and 2021-1210]). Recently, computer modeling and statistical analyses have garnered acceptance as evidence of partisan intent (see id. at *24-26; League of Women Voters of Pennsylvania v Commonwealth, 645 Pa 1, 124-126, 178 A3d 737, 818-820 [2018]).
We conclude that evidence of the largely one-party process used to enact the 2022 congressional map, a comparison of the 2022 congressional map to the 2012 congressional map, and the expert opinion and supporting analysis of Sean P. Trende, met petitioners' burden of establishing that the 2022 congressional map was drawn to discourage competition and favor democrats in violation of article III, § 4 (c) (5). First, democratic leaders in the legislature drafted the 2022 congressional redistricting map without any republican input, and the map was adopted by the legislature without a single republican vote in favor of it. Second, under the 2012 congressional map there were 19 elected democrats and 8 elected republicans and under the 2022 congressional map there were 22 democrat-majority and 4 republican-majority districts.
While we conclude that those two points were not enough, by themselves, to constitute proof beyond a reasonable doubt, the testimony of Trende was probative and confirmed the inference from the above two points that the legislature engaged in unconstitutional partisan gerrymandering when enacting the 2022 congressional map. Trende was accepted by the parties as an expert in elections analysis with particular knowledge of redistricting. His direct testimony and his expert reports also were received in evidence without objection. Thus, any foundational or relevance objection now raised by respondents has been waived (see generally Horton v Smith, 51 NY2d 798, 799 [1980]). Trende largely relied on a computer simulation accepted in other jurisdictions and data-driven metrics in order to conclude that the enacted 2022 congressional map was drawn to disfavor competition and favor democrats. Using the accepted computer program, Trende generated, inter alia, 5,000 simulated district maps for New York by randomly aggregating voting precincts, subject to certain criteria, to create the requisite 26 congressional districts. According to Trende, the simulated maps reflected what one would expect if maps had been drawn without respect to partisan criteria.
Trende concluded that the enacted congressional map pressed republican voters "into a few [r]epublican-leaning districts, while spreading [d]emocratic voters as efficiently as possible." Trende analyzed the differences between his ensemble of simulated maps and the enacted map using various methods, including application of the "gerrymandering index," which, he concluded, rendered it "implausible, if not impossible" that the enacted redistricting plan had been drawn without partisan intent. Trende also portrayed his results in scatterplots, which he explained showed how "[t]he only place where the [e]nacted [c]ongressional [m]ap falls within expectations is in safely [d]emocratic districts," whereas the more competitive districts were made safer by packing republican voters into other republican-leaning districts. Specifically, Trende's simulation reflected that the four most republican-leaning districts in the enacted congressional map were more republican-leaning than any of his initial 5,000 simulated maps. Of the next nine most competitive districts, the enacted map was, in each, more democrat-leaning than any or nearly all of the initial 5,000 simulated maps. Of the next 13 less-competitive and democrat-leaning districts, the enacted map largely fell as expected within the range of those simulated maps. As Trende testified, "[t]hat is the DNA of a gerrymander," and the result is exactly what gerrymandering looks like, i.e., where the voters of the disfavored party are disproportionately "packed" into districts already favoring that party in order to make the districts around them either flip or become less competitive (see League of Women Voters of Pennsylvania, 645 Pa at 127). That pattern was reflected across all 26 congressional districts and was further supported by Trende's other metrics of partisanship such as his use of the gerrymandering index, which has been legally accepted in the redistricting context (see Szeliga v Lamone, C-02-CV-XX-XXXXXXX at 66, 89-90 [Cir Ct, Anne Arundel County, Md March 25, 2022]). In other words, the possibility that Trende's ensemble of simulated maps all had certain [*5]characteristics inconsistent with any actual map-drawing process could explain why certain districts or portions of districts on the enacted congressional map did not precisely correspond to Trende's simulation. That possibility does not, in our view, offer an explanation, other than a violation of article III, § 4 (c) (5), as to why the enacted congressional map was such an outlier in Trende's simulation only in the districts where the legislative majority party had the most strategic value to gain through gerrymandering.
During the trial, it was undisputed that Trende's computer simulation and resulting statistical analyses were only as reliable as the computer model he used, and the inputs and controls he incorporated therein. Yet in response to respondents' criticism that he did not run a sufficient number of simulated district maps, Trende generated 10,000 additional maps, which confirmed his prior results. And in response to respondents' criticism that he did not take into account certain criteria that the legislature was required to consider under article III, § 4 (c), he reran the simulations to use additional constraints, which also confirmed his prior results. In fact, the only criteria respondents now identify that Trende did not take into account was "communities of interest," which he explained were notoriously difficult to account for because of their vague definition, a fact conceded by one of respondents' experts. It is implausible that the failure to account for this one criterion in the simulated maps coincidentally resulted in showing that the enacted map had all four republican-leaning districts being more republican-leaning, all the next nine most competitive districts being more democrat-leaning, and the "safest" democrat-leaning districts falling within the range of the simulated maps.
Respondents also questioned whether Trende's simulation for the congressional map had relied on redundant, i.e., repeated or partially repeated maps. Further, it was undisputed that Trende did not review, and did not submit for review, the simulated maps, and instead based his analysis on the aggregate data generated from those maps. We note, however, that respondents failed to object to the alleged redundancies or to the absence of the simulated maps, and that none of respondents' experts presented their own competing simulation reflecting how the results might have changed had Trende conducted his model in a manner that they opined to be more appropriate. Moreover, none of respondents' evidence contradicted the overwhelmingly consistent pattern Trende's model produced. Respondents seem to argue that no computer simulation could ever account for all of the constitutional criteria, and thus petitioners would need to show proof of a "smoking gun" to prove partisan gerrymandering, such as an admission by the map drawers that they intended to favor a certain political party. Such direct evidence is rare and certainly not required for petitioners to meet their burden. Rather, petitioners may rely on circumstantial evidence (see League of Women Voters of Ohio, — NE3d at &mdash), which, as established in this case, is just as probative to establish that the redistricting plan was drawn with partisan intent. 
We reject respondents' contention that the enacted 2022 congressional map favored republicans by creating more republican-leaning districts, defined as those districts where the republican voting share was above 50%, than Trende's computer simulation would generally expect. Although the 2022 congressional map created more republican-leaning districts than the majority of Trende's simulated maps, the result of making the four republican-leaning districts less competitive in favor of republicans had, as Trende's testimony and report explained, the effect of rendering the next most competitive nine districts less competitive in favor of democrats, consistent with a pattern of gerrymandering (see League of Women Voters of Pennsylvania, 645 Pa at 127). In any event, there were eight elected republicans under the 2012 congressional map drawn by a court, and by boldly asserting that the 2022 congressional map, which resulted in four more republican-packed districts drawn in an exclusively democratic-driven process in 2022, actually evinces a plan favoring republicans, respondents have created a further inference that they acted with a partisan purpose favoring democrats.
Moreover, we do not accept respondents' premise that this appeal turns on whether Trende's analysis, standing alone, established partisan favoritism beyond a reasonable doubt. Instead, Trende's analysis was corroborated by the inference of gerrymandering evident "by application of simple common sense" from the enacted map itself and its likely effects on particular districts (Adams v DeWine, — NE3d &mdash, 2022 WL 129092, *1 [Ohio Sup Ct, Jan. 14, 2022, Nos. 2021-1428 and 2021-1449]). Courts have long recognized the tendency of legislatures to engage in political gerrymandering (see Vieth v Jubelirer, 541 US 267, 274 [2004]). "[I]t requires no special genius to recognize the political consequences of drawing a [*6]district line along one street rather than another . . . [D]istricting inevitably has and is intended to have substantial political consequences" (Gaffney v Cummings, 412 US 735, 753 [1973] [emphasis added]). "As long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended" (Davis v Bandemer, 478 US 109, 129 [1986]).
In sum, considering the direct and circumstantial evidence offered by petitioners in totality (see League of Women Voters of Ohio, 2022 WL 110261, at *24), we are satisfied that petitioners established beyond a reasonable doubt that the legislature acted with partisan intent in violation of article III, § 4 (c) (5) (see Harper v Hall, 868 SE2d 499, 527-528, 553-555 [NC Sup Ct 2022]; League of Women Voters of Ohio, 2022 WL 110261, *24-27; see generally People v Bracey, 41 NY2d 296, 301 [1977], rearg denied 41 NY2d 1010 [1977]).
We have considered respondents' remaining contentions and conclude that they lack merit.
Having determined that the procedure used to enact the 2022 congressional map is valid but that the map itself is unconstitutional, we conclude that the legislature "shall have a full and reasonable opportunity to correct the law's legal infirmities" (NY Const, art III, § 5). Consistent with this Court's prior order entered upon respondents' motion to stay Supreme Court's order pending this appeal, the legislature has until April 30, 2022 to enact a constitutional replacement for the congressional map. The matter will then be remitted to Supreme Court for further proceedings. We therefore further modify the judgment accordingly.
Centra and Lindley, JJ. concur; Whalen, P.J., and Winslow, J. dissent in part in accordance with the following memorandum: We respectfully dissent in part inasmuch as we agree with respondents-appellants (respondents) that Supreme Court erred in concluding in the alternative that the congressional map enacted by the legislature was unconstitutional because it violated article III, § 4 (c) (5) of the New York State Constitution. As acknowledged by the plurality, petitioners bore the burden of establishing beyond a reasonable doubt that the relevant statute conflicted with the New York State Constitution (see People v Viviani, 36 NY3d 564, 576 [2021]; Overstock.com, Inc. v New York State Dept. of Taxation & Fin., 20 NY3d 586, 593 [2013], cert denied 571 US 1071 [2013]; Cohen v Cuomo, 19 NY3d 196, 201-202 [2012]). On this record, however, we conclude that petitioners failed to meet their heavy burden of establishing that the legislature's enactment of the 2022 congressional map conflicted with the constitutional prohibition against the drawing of districts "to discourage competition or for the purpose of favoring or disfavoring incumbents or other particular candidates or political parties" (NY Const, art III, § 4 [c] [5]).
At trial, petitioners relied primarily on a computer modeling and statistical analyses expert, Sean P. Trende (expert). As the plurality notes, such data-driven evidence has been relied upon by courts considering challenges to redistricting maps (see League of Women Voters of Ohio v Ohio Redistricting Commn., — NE3d &mdash, 2022 WL 110261, *24-26 [Ohio Sup Ct, Jan. 12, 2022, Nos. 2021-1193, 2021-1198, and 2021-1210]; League of Women Voters of Pennsylvania v Commonwealth, 645 Pa 1, 124-126, 178 A3d 737, 818-820 [Pa 2018]). Indeed, partisan intent, like discriminatory intent, will "rarely be so obvious or its practices so overt that recognition of it is instant and conclusive" (300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 183 [1978]) such that a petitioner will be able to succeed on a redistricting challenge on that ground absent data-supported expert testimony.
We nonetheless conclude that the expert evidence proffered by petitioners here is insufficient to establish unconstitutional partisan intent beyond a reasonable doubt. As the plurality explains, the expert utilized a computer program to generate, inter alia, 5,000 simulated district maps for New York State by randomly aggregating voting precincts to create the requisite 26 congressional districts. Initially, the computer simulation technique— i.e., the algorithm—underlying the expert's production of purportedly partisan-neutral maps and the resulting data in his reports is not of his own creation. Instead, the algorithm underlying all of the expert's conclusions comes from an academic paper that has not yet completed peer review. Further, as acknowledged by the expert himself during his testimony, the value of the simulated maps that the algorithm produces is highly dependent on the scale of the redistricting map being considered, as well as the computer model's mirroring of the legal constraints placed on map-[*7]drawers themselves. Indeed, the expert agreed during his testimony that, "from a mathematician's perspective," redistricting algorithms struggled with real-world application. Despite those concerns and the testing by the academic paper's authors of their proposed algorithm on a small map of 50 precincts, the expert applied the algorithm across all of New York's 14,000-plus precincts.
Moreover, as indicated in his reports and made clear on
cross-examination of his expert testimony, the expert's computer model failed to account for all the criteria the legislature was required to consider during the redistricting process. To that end, the legislature was required to enact a congressional map that was not only free from partisan bias, but also protected racial or language minority voting rights; ensured an equal number of inhabitants in each district to the extent practicable; created contiguousness and compact districts; maintained the cores of existing districts and preexisting political subdivisions, including, among other things, communities of interest (NY Const, art III, § 4 [c]), and adhered to the requirements of the Federal Voting Rights Act (52 USC § 10301).
The initial report produced by the expert relied on simulated maps that took into account only three of these factors, producing districts that purported to have an absence of partisan influence and the creation of "equipopulous," reasonably compact districts that avoid county splits. When challenged on that point, the expert candidly conceded that "[c]ommunities of interest are a notoriously difficult concept to nail down," rendering them difficult to account for in the computer model, and that the relevant requirements of the Voting Rights Act were "confusing and seemingly ever-changing." Petitioners similarly assert in their respondent's brief that "[n]o one can build [a communities-of-interest] consideration into simulations because of the contested nature of the communities-of-interest." If true, then—as the algorithm's own authors warned—the inability of the expert's computer model to incorporate "realistic legal constraints" precludes successful application of that model.
Moreover, it is not clear that the simulated maps properly accounted for the relevant criteria that the expert chose to include. The expert also did not consider, nor could he cause the computer model to consider, that there had been bipartisan support for maintaining the "cores of [certain] existing districts" (NY Const, art III, § 4 [c] [5]) such as the Southern Tier and the metropolitan areas of Albany, Syracuse, Rochester, and Buffalo prior to the breakdown of the independent redistricting commission process. Indeed, the expert could not articulate the specific manner in which the computer model had accounted for prior district cores. Further, the expert testified that the computer modeling program had trouble adjusting for criteria such as compactness and balancing competing interests. With respect to the former, the expert testified that, although adjustable, only one compactness setting would avoid performance issues with the program. In contrast, in his similar work in a Maryland case, the expert appears to have run multiple models with different compactness settings in order to account for the variable nature of the parameter (see Szeliga v Lamone, C-02-CV-21-001773, C-02-CV-21-001816, at 63 [Cir Ct, Anne Arundel County, Md Mar. 25, 2022]).
Although it is possible that concerns regarding the parameters utilized by the expert might have been dispelled by a review of the simulated maps produced, the simulated maps were not submitted. In fact, the expert acknowledged that he never reviewed the simulated maps the algorithm produced. Those failures leave unaddressed concerns over the existence of potential redundancies in the arguably already small sample size utilized by the expert, which is a valid concern where the expert's production of simulated map ensembles of 250,000 in the Maryland case yielded only 30,000 to 90,000 nonduplicative maps (see Szeliga, C-02-CV-21-001773, C-02-CV-21-001816, at 63).
In response to the concerns raised by respondents' experts and during cross-examination of the expert that the failure to consider all relevant criteria undermined the validity of his methodology, the expert continuously responded that if there was anything "missing that makes a difference, . . . [respondents' experts] can do it," inasmuch as his role was to "opine on the partisanship of the districts." As noted above, however, the high burden in this case is on petitioners to establish beyond a reasonable doubt that the 2022 congressional map conflicts with the Constitution, and a court may only "strike [that map] down . . . after every reasonable mode of reconciliation of the [2022 congressional map] with the Constitution has been resorted to, and reconciliation has been found impossible" (White v Cuomo, — NY3d &mdash, 2022 NY Slip Op [*8]01954, *4 [2022] [internal quotation marks omitted]).
The above issues raise reasonable doubt regarding the validity of the methodology used by petitioners' expert to reach the conclusion that the 2022 congressional map was drawn with partisan intent in violation of New York Constitution, article III, § 4 (c) (5). Thus, before us is not the credibility issue routinely seen in battle-of-the-experts cases (see e.g. Matter of George L., 85 NY2d 295, 305 [1995]; Barton v Youmans, 24 AD3d 1192, 1192 [4th Dept 2005]), but an issue of the probative force of an expert opinion unsupported by sufficient evidence regardless of respondents' opposition (see Caton v Doug Urban Constr. Co., 65 NY2d 909, 911 [1985]; Silverman v Sciartelli, 26 AD3d 761, 762 [4th Dept 2006]; see generally Diaz v New York Downtown Hosp., 99 NY2d 542, 544 [2002]; Sawyer v Dreis & Krump Mfg. Co., 67 NY2d 328, 335 [1986]). Inasmuch as the record does not support the conclusion that the computer model utilized here produced simulated maps subject to the constitutional and statutory restraints within which the legislature must operate, there is an insufficient basis for the conclusion, either by the expert or this Court, that "among all possible compliant [congressional] plans . . . , the adopted plan was an outlier" (League of Women Voters of Ohio, — NE3d at — [emphasis added]). We note that there are also significant reliability concerns with aspects of the opinion and report of petitioners' other expert.
Further, we reject petitioners' contention that the mere fact that the 2022 congressional map was drawn by elected democrats warrants the extreme relief of judicial intervention requested here. We would add, however, that if we were to assume such unlawful intent on the part of individual legislators, we would be ignoring our obligation to afford legislative enactments "a strong presumption of constitutionality" (Schulz v State of New York, 84 NY2d 231, 241 [1994], rearg denied 84 NY2d 851 [1994], cert denied 513 US 1127 [1995]), as well as impermissibly "presum[ing] an intent to pass an unconstitutional act" (De Camp v Dix, 159 NY 436, 443-444 [1899] [Parker, CJ, dissenting]). The bar for establishing the unconstitutionality of a legislative act, regardless of whether reasonable minds disagree on legality, is extremely high. It should be no less so when we must consider a legislator's motivation—indeed, it should not be overlooked that proof beyond a reasonable doubt is the same standard we apply to criminal prosecutions. Legislators, like their counterparts in the executive and judicial branches, have sworn oaths to uphold the New York State Constitution and violations of those oaths should not be assumed absent strong evidence to the contrary.
Here, petitioners have failed to meet the high burden of proving beyond a reasonable doubt that the legislature drew the 2022 congressional district map in a manner "to discourage competition or for the purpose of favoring or disfavoring incumbents or other particular candidates or political parties" (NY Const, art III, § 4 [c] [5]). Thus, although we agree with the remainder of the plurality's analysis, we would nonetheless declare the 2022 congressional map constitutional.
Curran, J., dissents in part in accordance with the following memorandum: I join the plurality's disposition and its reasoning with respect to its determination that the 2022 map of congressional districts violates article III, § 4 (c) (5) of the New York State Constitution, but I write separately to address the issue of the procedure used by the legislature in adopting the redistricting maps. Initially, I largely adopt the well-reasoned analysis of the procedural issue offered in the amicus curiae brief filed by The League of Women Voters of New York State. Specifically, I agree that the 2014 amendments to the New York State Constitution clearly set forth "[t]he process for redistricting congressional and state legislative districts" (NY Const, art III, § 4 [e]). The process is described throughout sections 4 and 5-b with a series of mandatory tasks made so by the repeated use of the word "shall." The use of the words "[t]he process for redistricting" (§ 4 [e] [emphasis added]) and the mandatory performance of functions within a necessarily short time frame are "plain and precise" and must be given "full effect" (People v Rathbone, 145 NY 434, 438 [1895]). "It must be presumed" that the "force of the language used" was "understood" by those who adopted the constitutional provision (id). Thus, "the courts [are] bound to strictly enforce [the] provisions" (Dempsey v New York Cent. & Hudson Riv. R.R. Co., 146 NY 290, 294 [1895]).
It is undisputed on this record that the Independent Redistricting Commission (IRC) violated the constitutionally-mandated process by failing to submit a second proposed redistricting plan. The question is whether the 2014 amendments provide a remedy for that [*9]violation of law. Respondents-appellants (respondents) contend and the plurality concludes that the 2014 amendments are silent on the issue and that the remedy for the IRC's violation of law is to revert back to the legislature's historic authority to establish legislative district lines. I respectfully disagree, and therefore dissent in part and would affirm those parts of the judgment determining that the congressional and state senate maps are invalid due to an unlawful process by the legislature in adopting those maps. I note that, inasmuch as petitioners did not challenge the propriety of the state assembly map, Supreme Court erred in sua sponte determining that the assembly map is invalid, and I therefore agree with the plurality's disposition on that issue.
Section 4 (e) was added to the Constitution as part of the 2014 amendments. It provides that "[t]he process for redistricting congressional and state legislative districts established by this section and sections 5 and 5-b of this article shall govern redistricting in this state except to the extent that a court is required to order the adoption of, or changes to, a redistricting plan as a remedy for a violation of law" (emphasis added). Also as part of the 2014 amendments, section 5 was supplemented with additional language with respect to judicial review of "[a]n apportionment by the legislature" (NY Const, art III, § 5). The full text of that supplemented section is set forth below with emphasis highlighting the language added to section 5 in 2014: "An apportionment by the legislature, or other body, shall be subject to review by the supreme court, at the suit of any citizen, under such reasonable regulations as the legislature may prescribe; and any court before which a cause may be pending involving an apportionment, shall give precedence thereto over all other causes and proceedings, and if said court be not in session it shall convene promptly for the disposition of the same. The court shall render its decision within sixty days after a petition is filed. In any judicial proceeding relating to redistricting of congressional or state legislative districts, any law establishing congressional or state legislative districts found to violate the provisions of this article shall be invalid in whole or in part. In the event that a court finds such a violation, the legislature shall have a full and reasonable opportunity to correct the law's legal infirmities" (id. [emphasis added]).
Respondents rely upon the newly added language that, when "any law establishing congressional or state legislative districts [is] found to violate the provisions of this article," "the legislature should have a full and reasonable opportunity to correct the law's legal infirmities." Thus, respondents contend that section 4 (e) and the language added to section 5 are to be read as having the same effect of allowing the legislature an opportunity to correct the legal infirmities of a law establishing congressional or state legislative districts. Thus, respondents effectively maintain that the "legal infirmities" referenced in section 5 are the necessary equivalent of a "violation of law" remediable by a court under section 4 (e). I again respectfully disagree because, by reading section 4 (e) and the newly added language in section 5 to provide the same remedy, respondents impermissibly make one or the other "idle or nugatory" (People ex rel. Balcom v Mosher, 163 NY 32, 36 [1900]).
In my view, a "violation of law" under section 4 (e) is a broader concept than the "legal infirmities" in an apportionment plan under section 5. The former includes a violation of law occasioned by action or inaction of the IRC or the legislature in funding or constituting the IRC. Such actions or inactions are violations of law with respect to the process for redistricting established by section 4 (e) that are not logically curable except by judicial intervention. Thus, when either the legislature or the IRC, through inaction or action, defeat the primary role of the IRC in performing its duty to prepare redistricting plans, it becomes the unwelcome task of the judiciary to step into the breach and adopt a redistricting plan, and thus the legislature did not have the authority to adopt the maps at issue in this appeal. I submit that any other reading of section 4 (e) renders the IRC a useless formality (see Mahnk v Blanchard, 233 App Div 555, 561 [4th Dept 1931]). Such an absurd result could not have been intended by the two separate legislatures that voted with bipartisan support to propose the 2014 amendments or by the people of the State of New York who approved the IRC's creation with a majority vote in 2014.
I nevertheless agree with the plurality's disposition of this appeal to allow the legislature an opportunity to cure the clear legal infirmities in its congressional redistricting plan. That is so because petitioners failed to cross-appeal from the judgment, and thus the propriety of the remedy ordered by Supreme Court allowing the legislature an opportunity to correct infirmities is not properly before this Court (see Bellevue S. Assoc. v HRH Constr. Corp., 78 NY2d 282, 299 n 5 [1991]). In short, despite my reading of the 2014 amendments that differs from the plurality, I am compelled to conclude that we are without jurisdiction to further modify the judgment by [*10]eliminating an opportunity for the legislature to cure the legal infirmities.
Entered: April 21, 2022
Ann Dillon Flynn
Clerk of the Court